(No. 58652.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PERRY OLINGER, Appellant.

*Opinion filed April 18, 1986.—Rehearing denied June 2, 1986.*

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Mark L. Rotert and Joan G. Fickinger, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Perry Olinger, and a codefendant, William Duncan, were convicted by a Whiteside County jury of the murders of James Adams, Gordon Stevens and Debbie Bushman. The two were also convicted of armed robbery, armed violence, and conspiracy. Duncan and defendant both waived a jury for sentencing, and a separate hearing was held before the trial court. The court

sentenced Duncan to life in prison and sentenced defendant to death. Defendant appealed directly to this court, as a matter of right. Ill. Const. 1970, art. VI, sec. 4(b). See also Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i); 87 Ill. 2d R. 603.

Defendant raises 16 issues on appeal: (1) Did the court improperly refuse to allow into evidence exculpatory portions of defendant's statements when other portions of those statements were used by the State? (2) Did defendant validly waive a potential conflict of interest between himself and his attorney? (3) Should a mistrial have been declared when the State erroneously attempted to impeach a defense witness with a nonexistent prior statement? (4) Was the defendant denied due process by the State's failure to disclose certain information? (5) Was it error to refuse defendant's motion for a change of venue? (6) Was it error to exclude prospective jurors who could not vote for the death penalty? (7) Did the court improperly refuse to sever defendant's trial from that of his codefendant? (8) Did the court err in allowing hearsay evidence as to the state of mind of one of the victims prior to his murder? (9) Did allegedly improper remarks by the prosecutors during closing argument deprive defendant of a fair trial? (10) Did the trial court fail to exercise its discretion to allow the jury to see transcripts of certain testimony? (11) Was it error to refuse the second paragraph of the Illinois pattern jury instruction on circumstantial evidence? (12) Did the court, in sentencing, rely on aggravating factors which were not proved? (13) Did the court place an improper burden on defendant to prove that the death penalty does not apply? (14) Did the court fail to consider relevant mitigating factors? (15) Is the Illinois death penalty statute unconstitutional because, defendant says, it requires the defendant to prove that death is inappropriate and because, defendant claims, it gives no guidelines as

to when the prosecutor should seek the death penalty? and (16) Does the Illinois death penalty statute fail to narrow to a unique and cognizable group those persons eligible for the death penalty?

On May 25, 1982, James Adams was found dead in his home in Rock Falls, Whiteside County, the victim of knife wounds on his neck and throat. On the same day Gordon Stevens and Debbie Bushman were found dead in their home in nearby Sterling, each having been shot once in the head. On October 28, 1982, after a five-month investigation, defendant and a codefendant, William Duncan, were charged by indictment with the three murders. The indictment also charged both with armed robbery, armed violence, and conspiracy.

Prior to trial, defendant moved for a change of venue from Whiteside County, alleging that the extensive pre-trial publicity would prevent a fair trial. The motion was denied. Defendant also filed several motions for severance, alleging that he and Duncan had antagonistic defenses. These motions were also denied.

At trial the State's evidence disclosed that the body of James Adams was found by his girlfriend, Tina Taber, at about 10 a.m. on May 25, 1982. Taber also discovered Duncan asleep on a couch several feet from Adams' body. An autopsy showed that Adams had been cut on the face and the throat, and had been struck on the head with a blunt instrument.

At about 11:30 a.m. on the same day, Susan Neuman, a friend of Stevens and Bushman, discovered the bodies of the two dead in their home. Neuman testified that she found the door ajar, although Stevens and Bushman never left the door unlocked. Both Neuman and another witness, Jeff Allen, testified that Stevens and Bushman always kept their doors locked, and that when someone came to their door Stevens or Bushman would look out the window before allowing the person entry. Allen testi-

fied that Stevens had been well acquainted with defendant and had engaged in past drug dealings with him. Investigators at the Stevens/Bushman residence found no signs of forced entry.

Witnesses also detailed the movements of Adams, Duncan, and defendant on the days preceding the murders. On May 23, 1982, Duncan and Adams had traveled to Kansas City, Missouri, to purchase drugs from an acquaintance of Duncan's. All of the purchase money was supplied by Adams. Upon their return to Adams' house on May 24, Adams placed several phone calls "to get out the word" that he had cocaine available. Defendant came to Adams' house and attempted to purchase cocaine on credit, offering to leave a .45-caliber revolver as collateral, but Adams refused the offer. Later, defendant returned and purchased cocaine on credit, leaving a high-powered rifle as collateral. Meanwhile Adams, Duncan, and several other persons consumed cocaine at Adams' house throughout the day on May 24.

Early on the morning of May 25, Adams left his house and went to Randy Stralow's house. Defendant returned to Adams' house, where Duncan was staying. Duncan and defendant consumed cocaine for several hours. During this time Duncan telephoned Stralow's house four times, talking to Adams each time. The first call, at about 2:30 a.m., Duncan inquired when Adams would return. The second call, about 3:30 a.m., Duncan informed Adams that Adams' dog, Brutus, had run off when he was let outside. Defendant and his girlfriend, Rhonda Odquist, then went out to try to find Brutus and filed a report on the missing dog at the Rock Falls police station. About an hour later they found Brutus and returned him home, and Duncan called Adams for the third time and informed him that Brutus had returned. Defendant left Adams' house sometime around 5 a.m., and Duncan made a fourth call to Adams, again asking

Adams when he would return.

Stralow testified that Adams had had about $1,800 on his person that morning, and Adams had counted it several times. Adams left Stralow's house with the money at about 7 a.m. No money was found on Adams' body or in his house after the murder.

The State also introduced evidence as to statements made by defendant to police and to the grand jury. Defendant had mentioned that he, Adams, and Stevens had been a "drug triangle," each helping the others to sell drugs when they had some available. He also admitted to a burglary on May 22, 1982, where several pistols were stolen from the house of a man named Dennis Burris. The court, however, refused to let defendant on cross-examination bring out additional exculpatory portions of the same statements.

Although the weapon which killed Stevens and Bushman was never recovered, the State linked the murder weapon to the Burris burglary. Burris testified that he had shot a dog with a .22 magnum, one of the stolen pistols, prior to the burglary. The dog's body was exhumed and, according to the State's firearms expert, the bullets found in the dog were fired from the same gun as the bullets found in Stevens and Bushman.

Two witnesses, Darrell Onken and Edward Stalder, also testified to the Burris burglary. Onken testified that on May 22 he, Stalder, and defendant were drinking at a local tavern. They all talked about how they had little money, including defendant. They decided to commit a burglary and drove to the Burris residence. Onken stood lookout while Stalder and defendant went into the house. They returned with a "gunny sack," although Onken did not see what was in the sack. Onken testified that he did not receive any proceeds from the burglary and did not know what, if anything, the other two participants received.

Stalder also confirmed that the three had been in a local bar talking about their lack of money before deciding to commit a burglary. Stalder testified that they stole several pistols including the .22 magnum, a .38-caliber pistol, and two black powder pistols. Stalder eventually took the .38 and the two black powder guns but claimed that he did not receive the .22 magnum which was eventually linked to the Stevens and Bushman murders.

Stalder also testified that while driving around after dropping off Onken, defendant asked him to join in "taking over" the Whiteside County drug business. According to Stalder defendant suggested that he and Stalder steal drugs from Adams and Duncan and "make sure there wasn't any witnesses left." Stalder said that he declined this offer.

The State also offered testimony to show that after the murders defendant, who was unemployed, had large amounts of money. One witness said that on the day after the murder defendant paid a gas station bill with a $100 bill. Another witness, Patty Doyle, said that defendant had a "large wad" of bills a few days after the murder. Doyle also testified that when she talked to defendant about the murders defendant said that "Jim [Adams] said all the coke was left at Randy's [Stralow]."

Defendant's mother testified on his behalf. She stated that defendant had received a large amount of money from a bank loan on May 6, 1982. Defendant's girlfriend, Rhonda Odquist, testified that about 6:45 a.m. on May 25 defendant left his house to go fishing, returning at about 7:30 or 8 a.m. Another witness said that he saw defendant's truck near a fishing canal at about 7 a.m. on May 25.

Other witnesses for defendant testified that they saw persons who did not look like defendant in front of the Stevens/Bushman residence at various times on the

morning of May 25.

Duncan's case included Duncan's own testimony as to the trip to Kansas City and the events prior to the murders. He claimed that about 5:30 a.m. on May 25 he had taken a capsule containing sinequon, an antidepressant drug which can induce deep sleep. At the police's request Duncan had had a blood test on May 25, at about 3 p.m., and the results had revealed the presence of sinequon in his system. The expert witnesses, however, could not specify when Duncan had taken the sinequon or how much he had taken.

We initially address defendant's argument that he was improperly precluded from bringing out exculpatory portions of his statements to the police and the grand jury. The State introduced a portion of those statements, including the statement that defendant, Adams, and Stevens were a "drug triangle," and defendant's admission that he took part in the Burris burglary. Citing *People v. Weaver* (1982), 92 Ill. 2d 545, defendant argues that when part of a statement is admitted into evidence a defendant has the right to introduce the rest of the statement. This sweeping assertion, however, goes far beyond the *Weaver* decision. In *Weaver* the additional details which defendant sought to introduce were necessary to prevent the jury from being misled by the portion of the statement introduced by the State. The *Weaver* court thus held that additional portions of a statement must be admitted when necessary to prevent the jury from receiving a misleading impression as to the nature of the statement. 92 Ill. 2d 545, 556-57.

In the case at bar, however, defendant did not argue at trial that the portions of the statements introduced by the State were misleading. He argued merely that when part of a statement is admitted the defendant may introduce any other part of the statement for any purpose. Defendant, in effect, attempted to introduce his own ex-

culpatory statements without having to take the stand and face impeachment. *Weaver* does not approve such a result. A defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State.

One of defendant's statements introduced by the State was his grand jury testimony admitting the Burris burglary. On appeal he points out that immediately after this admission he claimed that Stalder, and not he, had taken the .22 magnum which was eventually used to kill Stevens and Bushman. He argues that the failure to allow in this part of the statement gave the jury the mistaken impression that defendant had admitted possessing the murder weapon. Despite any merit this argument might have, it affords no basis to disturb defendant's conviction because it was not raised at trial. At trial defendant did not specify this particular statement as one he wished to use, nor did he explain the reasons why such a statement should be admitted. Instead he asked generally to allow in *all* exculpatory portions of the statements. The trial court need not *sua sponte* scrutinize the proffered statements to determine if there may be a rationale to admit some small portion thereof. It is defendant's responsibility to specify what portion of the statement is necessary for the purpose approved in *Weaver*. Defendant here did not meet that responsibility.

Defendant also argues that he did not validly waive a potential conflict of interest between himself and his attorney. In the middle of jury selection it was disclosed that defendant's counsel had been investigated by the Illinois Department of Law Enforcement for allegedly tampering with a witness, Darrell Onken. The investigation centered on allegations that the attorney had urged Onken to fabricate testimony. Conversations between defendant's lawyer and Onken were tape-recorded pursu-

ant to an eavesdropping order. Defendant was advised by the court that the investigation might lead to a conflict of interest between himself and his attorney, and defendant was given transcripts of all of the tape-recorded conversations. The State informed the court that they did not plan to prosecute defendant's lawyer. Defendant, however, was not admonished as to the possibility of disciplinary proceedings against the attorney. In response to the court's questioning defendant indicated that he wished to continue to be represented by his attorney notwithstanding the potential conflict.

Defendant now argues that any waiver was invalid because he was informed that the State would not prosecute his attorney but was not informed that his attorney could face disciplinary proceedings as a result of the alleged misconduct. The fundamental right to effective assistance of counsel requires that defendants be afforded counsel who is free of conflicting interests. (*Glasser v. United States* (1942), 315 U.S. 60, 76, 86 L. Ed. 680, 702, 62 S. Ct. 457, 467-68; *People v. Kester* (1977), 66 Ill. 2d 162, 166.) The right to conflict-free counsel may be waived (*Holloway v. Arkansas* (1978), 435 U.S. 475, 483 n.5, 55 L. Ed. 2d 426, 433 n.5, 98 S. Ct. 1173, 1178 n.5; *People v. Kester* (1977), 66 Ill. 2d 162, 168), but such a waiver must be knowing (66 Ill. 2d 162, 168). A defendant will not be deemed to have waived a conflict unless he is admonished as to the existence of the conflict and its significance. 66 Ill. 2d 162, 168-69.

This does not mean, however, that the trial court must engage in counseling the defendant. In the case at bar defendant was apprised of the potential conflict and provided with transcripts of the tape-recorded conversations between his attorney and Darrell Onken. Defendant was made aware of the general significance of the conflict by being informed that the misconduct alleged could lead to criminal prosecution against his attorney.

The duty to admonish the defendant as to the general nature of the conflict does not mean that the trial court must painstakingly detail every potential ramification of a potential conflict. The admonitions and disclosure of information in the instant case were sufficient, and we therefore hold that defendant validly waived any potential conflict.

Defendant also argues that a mistrial should have been declared when the State was unable to substantiate the attempted impeachment of a key defense witness. Rhonda Odquist, defendant's girlfriend, testified in support of defendant's alibi, but there was a question as to her alertness during the morning of May 25. Odquist on direct examination testified that she had taken a sedative pill on the afternoon of May 24, but on cross-examination the prosecution asked whether she had previously told police that she ingested the sedative during the early morning hours on May 25. The prosecution later discovered that they had been mistaken, and Odquist had not in fact made such a statement. Defendant moved for a mistrial, and the court recessed so that the attorneys could submit authority on the point. The following morning the court decided that the error could be cured by instructing the jury to disregard the attempted impeachment. The court thereupon admonished the jury as follows:

"Ladies and gentlemen of the jury, good morning. I am sorry for the delay, but we had legal matters which we had to consider out of the presence of the jury. Late yesterday afternoon the witness, Rhonda Odquist, was on the stand testifying, and during the course of that examination, Mr. Rotert for the prosecution inquired of her 'When you were in the residence of James Adams that particular evening, you were given what is referred to as a downer and you were given that pill by Bill Duncan?', to which she responded 'Yes'. Mr. Rotert then inquired of her 'This was given to you by Mr. Duncan while you were

in the residence between midnight and 4:00 in the morning?', and she responded, 'No'. Mr. Rotert inquired of her 'When was it given to you?', and she answered, 'In the afternoon'. Thereafter, Mr. Rotert, for the prosecution, inquired of her, 'Do you recall talking to a Detective named Harlan Carbaugh and a deputy Sheriff Glenn Frank with relationship to the investigation of this case on June 9, 1982?', to which she responded 'No'. He then asked her 'You don't recall talking to them?', and her answer was 'I don't recall the two names of the men.' 'Did you have any interview with two police officers in regards to the homicides on June 9, 1982?', and she responded, 'I talked to two police officers'. He then inquired of her 'And you told them at that time that before you left Adams' residence after the dog had been recovered that you took a downer?'. Miss Odquist answered 'No'. She did not tell them that. It was thereafter during the re-direct examination that Mr. Walter called it to the Court's attention that Miss Odquist had never talked to a detective named Harlan Carbaugh and a Deputy Sheriff Glenn Frank, and Mr. Rotert for the prosecution admitted that he was in error in that. The Court instructs you that this evidence is to be disregarded by the jury. That Miss Odquist was in fact correct in answering that she had not given such a statement to those police officers, and you are not to draw any inferences from these questions and answers that Miss Odquist spoke untruthfully on that subject. You are not to draw any such inferences."

It is improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information. (*People v. Burbank* (1972), 53 Ill. 2d 261, 269-70; *People v. Wallenberg* (1962), 24 Ill. 2d 350, 353.) In the instant case, however, the curative instruction to the jury served to completely remedy the improper impeachment. The trial court clearly explained the prosecutor's mistake, and in light of the court's admonition there is no way in which the defendant could have been preju-

diced by the incident. If anything the disclosure of the error to the jury undermined the prosecution's credibility, not that of the witness. We therefore do not find the denial of a mistrial to be error.

Defendant also argues that his conviction must be reversed because the prosecution failed to disclose exculpatory information to the defense, as required by *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. At the hearing on defendant's post-trial motions the defense presented a witness named Barry Tillman. Tillman testified that a woman named Sherry Thompson had told him that the wife of Kevin Anderson had told Thompson that she (Kevin Anderson's wife) had been present at the Adams, Stevens and Bushman murders. This information was relevant, argued defendant, since Kevin Anderson was an alternative suspect in the murders. Tillman testified that he had mentioned this information to the State's Attorney and to a police officer. The State had disclosed Tillman's name as someone they had talked to, but had not told the defense the substance of his revelations.

The State disputes the claim that Tillman had given this information to the State's agents prior to trial, but we need not decide this factual issue. There is no *Brady* violation if the nondisclosed information is not "material." (*United States v. Bagley* (1985), 473 U.S. 667, 678, 87 L. Ed. 2d 481, 491, 105 S. Ct. 3375, 3381.) Evidence is "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3384.) The nondisclosed evidence here could not possibly have affected the outcome because it is completely hearsay and would not have been admissible as evidence. Further, defendant can point to no admissible evidence which the Tillman information would have led

to. For this reason the failure to disclose Tillman's revelations did not deprive defendant of a fair trial.

Defendant also argues that he was denied a fair trial when the court refused to change the venue of the trial to another county. In *People v. Taylor* (1984), 101 Ill. 2d 377, this court reversed a conviction due to the failure to grant a change of venue, but noted that several of the jurors had specific knowledge of inadmissible evidence and should have been dismissed for cause. (101 Ill. 2d 377, 388-90.) A motion for change of venue must be granted only when " 'there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is reasonable apprehension that the accused cannot receive a fair and impartial trial.' " (*People v. Gendron* (1968), 41 Ill. 2d 351, 354, quoting *People v. Berry* (1967), 37 Ill. 2d 329, 331.) As a practical matter this means that a change of venue should be granted when it becomes apparent that it will not be possible to find 12 jurors sufficiently unfamiliar with the details of the case to withstand a challenge for cause. *People v. Taylor* (1984), 101 Ill. 2d 377, 387.

In the case at bar it is undisputed that there was extensive publicity regarding the murders, which were a highly unusual and sensational event in Whiteside County. Moreover, the extensive publicity clearly included mention of prejudicial evidence which would be inadmissible in the murder trial. Attached to the motion for change of venue were approximately 50 affidavits of Whiteside County citizens who were of the opinion that defendant could not get a fair trial in that county. Also attached to the motion were copies of newspaper reports about defendant, including extensive front-page coverage of defendant's prior criminal record and several specific offenses other than the ones charged in the instant indictment.

During jury selection it was revealed that a large

number of prospective jurors had some acquaintance with the case. After defendant exhausted his peremptory challenges he renewed his motion for a change of venue. The motion was again denied. Most of the persons actually chosen for the jury had heard of the case prior to the trial. There is, however, nothing in the record to indicate that any of the jurors actually accepted had been exposed to any of the prejudicial and inadmissible publicity. Moreover, none of the actual jurors had been challenged for cause by either defendant. Under these circumstances we cannot say that the denial of defendant's motion for a change of venue deprived him of a fair trial before an impartial jury.

We next address defendant's argument that he was denied due process because of the exclusion of prospective jurors who indicated that they would automatically vote against imposition of the death penalty. This court has already exhaustively examined the issues raised by this contention and has determined that this procedure does not deny a defendant the right to a jury drawn from a fair cross-section of the community (*People v. Neal* (1985), 111 Ill. 2d 180, 197; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38; *People v. Silagy* (1984), 101 Ill. 2d 147, 165), nor does it result in a conviction-prone jury (*People v. Neal* (1985), 111 Ill. 2d 180, 197; *People v. Collins* (1985), 106 Ill. 2d 237, 279; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38). We see no reason now to disturb these recent rulings.

Defendant also argues that it was error to deny his and Duncan's pretrial motions for severance. In support of these motions Duncan's counsel indicated that he planned to argue at trial that the inferences from the evidence showed that defendant, and not Duncan, committed the murders. Specifically, Duncan's counsel pointed to Patty Doyle's assertion that defendant had large amounts of money after the murders, defendant's state-

ments to Stalder regarding a plan to "take over" the drug traffic, and the evidence linking the murder weapon to the Burris burglary, and stated that this evidence showed that defendant had been the murderer. He also noted that Duncan might take the stand, and if he did, Duncan's counsel asserted, Duncan would testify that defendant was present prior to the murders, and was aware of the fact that Adams had money and cocaine. Finally, Duncan's counsel indicated that he might want to introduce defendant's statements to the police in the event that the State did not.

In addition to the representations of counsel the record also indicated that during the initial investigation of the murders Duncan had agreed to wear eavesdropping equipment to record conversations with several persons, including defendant.

The State, in response to the last of the amended severance motions, stated that the prosecution would not introduce the portions of Duncan's statements which implicated defendant. In addition, the tape-recorded conversations between Duncan and defendant were never offered as evidence. The trial court extensively examined Duncan's statements and deleted the numerous references to defendant.

As a general rule defendants who are jointly indicted are to be tried jointly unless a separate trial is necessary to avoid prejudice to one of the defendants. (*People v. Bean* (1985), 109 Ill. 2d 80, 92; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) Illinois law recognizes two separate grounds for severance. The first is the confrontation problem which arises when the State attempts to utilize statements of one codefendant which implicate the other defendant. (*Bruton v. United States* (1968), 391 U.S. 123, 134 n.10, 20 L. Ed. 2d 476, 484 n.10, 88 S. Ct. 1620, 1626-27 n.10; *People v. Bean* (1985), 109 Ill. 2d 80, 93.) This problem can be cured either by severance or by

removing from the statements all references to the moving defendant. (*People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42.) However, a second ground for severance is when codefendants' defenses are so antagonistic that one codefendant cannot receive a fair trial when tried jointly. (*People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 542.) This problem cannot be solved by any measures short of severing the trial of the prejudiced codefendant. *People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 542.

A motion to sever on the basis of antagonistic defenses is addressed to the sound discretion of the trial court. (*People v. Bean* (1985), 109 Ill. 2d 80, 92; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541; *People v. Canaday* (1971), 49 Ill. 2d 416, 424.) The motion cannot rely on mere apprehensions of prejudice but must state how the defendant would be prejudiced by a joint trial. (*People v. Bean* (1985), 109 Ill. 2d 80, 92; *People v. Lee* (1981), 87 Ill. 2d 182, 186.) However, in ruling on the motion the court must take into account "the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings." *People v. Daugherty* (1985), 102 Ill. 2d 533, 541.

In the case at bar we need not determine the sufficiency of the severance motions because we find that any antagonism between Duncan and defendant was not so severe as to deprive defendant of a fair trial. We find very little prejudice in the fact that Duncan's counsel attacked the credibility of defendant's witness, Rhonda Odquist. Odquist's testimony was in fact inconsistent and inconclusive. Further, while Duncan himself testified that defendant knew that Adams had large amounts of cash and cocaine on hand, this evidence merely corroborated the State's evidence on this point. Finally, in closing ar-

gument Duncan's counsel merely stated that defendant was more likely to have committed the murders than Duncan but did not specifically argue that defendant had, in fact, committed the crimes. Any minor prejudice which may have occurred was less than that found sufficient to reverse in cases such as *Daugherty* and *Bean*.

Defendant also claims that the trial court allowed in inadmissible hearsay. Prior to trial defendant moved to exclude certain statements made by James Adams several hours before his death. Prior to his death Adams had been at the house of a man named Randy Stralow. Adams allegedly told Stralow that "his friends" were trying to lure him home. Referring to the fact that his dog, Brutus, had gotten free, Adams allegedly said that "he figured they let him out." Adams also reportedly said that he felt bad because he would have to tape his cocaine to his chest to keep "his friends" from stealing it. The evidence indicated that both Duncan and defendant were at Adams' house at the time Adams allegedly made these statements to Stralow. Defendant argued that these were hearsay statements being used to show that Adams feared the defendants. The State argued that the statements merely showed that Adams' state of mind was such that he felt he had to hide his cocaine. The statements, the State claimed, were offered to explain why Adams was cut with a knife instead of being shot as were Stevens and Bushman, the State theorizing that Adams was tortured in an attempt to have him disclose where he had hidden his cocaine.

The trial court ruled that many of Adams' statements were inadmissible. The court, however, ruled that the State could introduce the statement that Adams "figured they let Brutus out." The State was also allowed to elicit the statement that Adams "felt pretty bad because I feel like I'm going to have to tape [the cocaine] to my chest." The court ruled, however, that the State was not

to use the statement to show that Adams feared defendant. Nonetheless, in closing argument the State argued that the statement showed that Adams knew that defendant and Duncan "wanted this drug more than they wanted anything else in life. He could see it and sense it coming." Defendant did not object to that part of the closing argument.

We agree with the State that Adams' belief that he would have to hide his cocaine did have some significance as an explanation for the fact that Adams was knifed instead of being shot as were Stevens and Bushman. Any improper use of this evidence in closing argument was waived by defendant's failure to object.

However, we agree with defendant that Adams' statement that he "figured they let Brutus out" does not qualify for the state-of-mind exception to the rule against hearsay. The victim's *belief* that defendant and Duncan let his dog out had no independent significance to the case and was obviously offered to show that defendant and Duncan had *in fact* let Brutus out. As such it was inadmissible hearsay. The error, however, was very minor. In view of the strong evidence against defendant, the error is insufficient to reverse defendant's conviction.

Defendant also argues that the prosecutor's closing arguments improperly minimized the significance of the court's instructions to the jury. The defendant, however, did not object to any of these remarks, and thus the issue must be deemed waived unless the remarks were so prejudicial as to constitute plain error. We have examined the prosecutor's remarks and find no reversible error.

Defendant also claims that the trial judge improperly failed to exercise his discretion to allow the jury to see transcripts of trial testimony. During jury deliberations the jury sent a note to the trial judge asking to see tran-

scripts of the testimony of several witnesses. The court had a discussion with the State and with counsel for Duncan and defendant, but the substance of the discussion does not appear on the record. The court noted for the record that he sent to the jury a note which read:. "No, the transcripts are not available. You must rely on your memories." The court noted defendant's objection to the failure to provide transcripts to the jury.

This court has held that transcripts of testimony may be shown to the jury if the jury so requests and if the trial court, in its discretion, believes the transcripts will be helpful. (*People v. Queen* (1974), 56 Ill. 2d 560, 565; *People v. Pierce* (1974), 56 Ill. 2d 361, 364.) In *Queen*, as in the present case, the discussions between the court and counsel did not appear on the record. The record showed only that the court sent the jury a note which read: "You must decide on the basis of the testimony heard in the courtroom. I cannot have any testimony of any witness read to you." This court reversed the conviction, holding that the court's note demonstrated that it did not realize that it had any discretion at all. (56 Ill. 2d 560, 565-66.) We believe that the trial court's remarks in the case at bar do not evidence a failure to exercise discretion, and thus we find no error in the refusal to send transcripts to the jury.

Defendant also claims error in the trial court's refusal to give the second paragraph of the Illinois pattern jury instruction on circumstantial evidence. The full instruction reads as follows:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [(the) (a)] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.
>
> You should not find the defendant guilty unless the

facts or circumstances proved exclude every reasonable theory of innocence." Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981).

In *People v. Evans* (1981), 87 Ill. 2d 77, 83, the court specifically required the use of the second paragraph of this instruction when "the proof of guilt, as to each element of the offense, is circumstantial." The court has twice reaffirmed the requirement. *People v. Crow* (1985), 108 Ill. 2d 520, 533-34; *People v. Jones* (1985), 105 Ill. 2d 342, 355-56.

In the case at bar we need not decide whether all of the State's evidence was circumstantial. In view of the nature of the evidence we find that the failure to properly instruct the jury was at most harmless error. Defendant's participation in the burglary of Dennis Burris' home was uncontroverted, as was the evidence linking the bullets found in Stevens and Bushman to a gun taken in that burglary. Moreover, Ed Stalder, a participant in the burglary, testified that he did not receive the murder weapon as proceeds of the burglary, and that he last saw it in defendant's possession. Moreover, Stalder testified that defendant, a few days before the murders, had suggested that Stalder join defendant in a scheme to "rip off" Adams and Duncan and "leave no witnesses." Finally, the evidence showed that defendant had very little money just before the murders but had large amounts of cash just after the murders. In view of this evidence we do not believe that the jury's verdict would have been any different had the second paragraph of the circumstantial evidence instruction been given.

Defendant also raises several issues with regard to his sentencing. First of all defendant claims that the death sentence cannot stand because the sentence was based upon findings that defendant personally killed James Adams and that defendant robbed Adams. It is not clear from defendant's brief whether he is attacking

only the sentence or if he is arguing that his conviction for Adams' murder must be reversed. It makes no difference, however, because, as noted above, the evidence that defendant killed Adams is very strong, and the fact that defendant suddenly had large amounts of cash after the murders, while Adams' cash suddenly disappeared, is strong evidence of robbery. Moreover, the lack of blood on Duncan, who was found sleeping in the same clothes he had been wearing before the murders, warrants the inference that defendant, and not Duncan, actually committed the fatal stabbing. We therefore find no error in the sentencing court's findings.

Defendant also argues that the trial court improperly placed the burden of proof at sentencing on defendant. At one point the court stated that the defendant had "the burden of proving [that the death penalty] does not apply." However, taken in context it is clear that the trial court meant only that once the State established the existence of statutory aggravating factors defendant had the burden of coming forward with evidence of mitigating factors sufficient to preclude imposition of the death penalty. This court has already determined that such a burden is constitutionally permissible. *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46.

Defendant also argues that it was error for the sentencing court to refuse to consider sympathy for the defendant as a mitigating factor. In *People v. Stewart* (1984), 104 Ill. 2d 463, 493-94, this court upheld an instruction to a sentencing jury that "neither sympathy nor prejudice should influence you" in determining whether the death penalty is proper. We continue to adhere to the position stated in *Stewart* that sympathy is not a proper factor to be considered in a death penalty hearing.

We also reject defendant's contention that the Illinois death penalty statute is unconstitutional because it gives

the prosecutor discretion as to whether or not the death penalty hearing will be sought. We continue to adhere to the position we first stated in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 536-43.

We also decline defendant's invitation to overrule *People v. Del Vecchio* (1985), 105 Ill. 2d 414. We continue to adhere to the position that it is permissible to place upon defendant the burden of coming forward with evidence of mitigating factors. 105 Ill. 2d 414, 445-46.

Finally, defendant argues that the death penalty statute is unconstitutional because it fails to adequately narrow the group of persons eligible for death from others guilty of murder. In *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44, this court held that the Illinois statute provided for adequate comparative review to assure that the death penalty was applied evenly and fairly. We believe that this holding also disposes of defendant's claim herein.

For the reasons stated herein, the judgment of the circuit court of Whiteside County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 16, 1986, as the date on which the sentence of death entered in the circuit court of Whiteside County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

When all the evidence against an accused is circumstantial in nature, *People v. Crow* (1985), 108 Ill. 2d 520,

mandates that the court instruct the jury not to find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence. I disagree with the majority holding that any error in not giving this instruction here was harmless (112 Ill. 2d at 350); I would therefore reverse the defendant's convictions and remand for a new trial.

It is clear from the recitation of facts in the majority opinion that no direct evidence against the defendant was presented. (*Cf. People v. Crow* (1985), 108 Ill. 2d 520.) Nevertheless, a jury could well have found Olinger guilty beyond a reasonable doubt based on the circumstantial evidence: he was placed at victim Adams' house on the morning of the murder; the gun which killed Stevens and Bushman had been stolen from its owner in a burglary in which he and Ed Stadler participated; he was observed with a "large wad" of cash following the killings; and (according to Stadler) he had previously announced his intention to take over the drug business in Whiteside County by stealing drugs from codefendant Duncan and Adams and making sure there were no witnesses left. This evidence, however, was not sufficiently strong to permit a reviewing court to find that the error in failing to instruct the jury properly was harmless; this is particularly so in view of the other errors which occurred.

Our recent decision in *People v. Crow* is instructive. There the defendant was charged with the murder of her husband. According to our opinion in that case, testimony placed her at the crime scene—the defendant's and victim's home—around the apparent time of the murder; the gun used as the murder weapon, which had been purchased by the defendant, was found in the house after the shooting; the police believed that there had been a transparent attempt to make the killing appear as if it occurred in the course of a burglary; the defendant had

a motive in that her husband was involved with another woman and defendant had once stated that she would kill her husband if he ever became so involved; and there was no sign of forced entry into the house. Despite this evidence, this court refused to find harmless the error in not instructing the jury to exclude every reasonable theory of innocence.

A different level of scrutiny appears to have been applied to the evidence in this case. While the evidence against the defendant was certainly incriminating, I am not willing to say from the cold record that a jury properly instructed would have necessarily convicted the defendant.

We should be especially slow to find error harmless where, as here, other significant errors also occurred. As the majority itself concludes, for example, Randy Stralow's testimony that Adams had said he figured that Olinger and Duncan let the dog out in order to lure him home was inadmissible hearsay.

Another ruling by the trial judge may have frustrated the jury's efforts to reach an accurate determination of guilt or innocence. The jury sent a note to the judge asking to see the transcripts of the testimony of several witnesses; the court responded by sending the jury a note which read: "No, the transcripts are not available. You must rely on your memories." Nothing in this response indicates to me that the trial judge realized that he had the discretion to provide the transcripts and simply thought it inadvisable. Thus, as in *People v. Queen* (1974), 56 Ill. 2d 560, the trial judge committed reversible error by failing to exercise his discretion. The summary refusal to provide transcripts, in a case involving more than 60 witnesses, could only have exacerbated the failure to instruct the jury not to find the defendant guilty unless based on the facts and circumstances it was able to exclude every reasonable theory of innocence.

Finally, I disagree with the majority's conclusion that the death penalty should be upheld even though the trial judge who imposed the death sentence was obviously confused on the question of the burden of proof at the sentencing hearing. Since a high standard of procedural accuracy is required in proceedings leading to a sentence of death (*People v. Holman* (1984), 103 Ill. 2d 133, 177), I believe this court has not given sufficient attention to the trial judge's statement that the defendant had "the burden of proving [that the death penalty] does not apply."

This court has held that "at the aggravation and mitigation hearing, there is no burden of proof, but, rather, the People have the burden of going forward with the evidence." (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446.) There can thus be no dispute that the trial judge's statement was erroneous; the State conceded as much in its brief. Nonetheless, the majority asserts without explanation that "in context it is clear that the trial court meant only that once the State established the existence of statutory aggravating factors defendant had the burden of coming forward with evidence of mitigating factors sufficient to preclude imposition of the death penalty." 112 Ill. 2d at 351.

Neither *Del Vecchio* nor *People v. Williams* (1983), 97 Ill. 2d 252, 302, held that the defendant has any burden of coming forward with evidence. Those cases held only that the *State* must come forward with evidence of aggravation. The sentencer may refuse to impose the death penalty based upon mitigation drawn from evidence at trial, from the State's case at the sentencing hearing, or simply as an exercise of mercy. The claim that the defendant has the burden of coming forward with mitigating evidence erroneously suggests that the death penalty must be imposed if the defendant does not do so. I do not believe that the eighth amendment permits such a result.

More important to the defendant in this case, who did

put on evidence in mitigation, is the majority's conclusion that the trial judge did not mean what he said. The majority opinion does not identify which portions of the record provide the context which makes "clear" that the judge understood that the defendant had no burden of proving that the death penalty "does not apply" (112 Ill. 2d at 351). Although the judge made some statements which could be interpreted as correctly explaining the method for determining the appropriate sentence, I cannot say with certainty which of his conflicting expressions actually guided his action. I would therefore vacate the death sentence.