# Illinois Official Reports

## Appellate Court

---

### *People v. Mitchem*, 2019 IL App (1st) 162257

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCELLUS MITCHEM, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>No. 1-16-2257 |
| Filed | October 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-1080-02; the Hon. Brian K. Flaherty, Judge, presiding. |
| Judgment | Affirmed |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

¶ 1     Following a jury trial, the defendant, Marcellus Mitchem, was convicted of aggravated kidnapping and aggravated vehicular hijacking and sentenced to concurrent terms of 32 years' imprisonment. He now appeals, arguing that the State failed to prove him guilty beyond a reasonable doubt, the circuit court abused its discretion when it denied his motion for a severance, and the circuit court abused its discretion by admitting evidence of other crimes. For the reasons that follow, we affirm.

¶ 2     We set forth the facts necessary to provide background for the defendant's several claims of error. Additional facts will be included as needed in later sections of this opinion.

¶ 3     The defendant and codefendant, Vernal Odom, were charged by indictment with, *inter alia*, aggravated vehicular hijacking and aggravated kidnapping of Antwain Avery. Both charges were predicated on the defendant being armed with a firearm during the commission of the offenses.

¶ 4     Prior to trial, the defendant moved to sever his trial on the basis that he and the codefendant had antagonistic defenses. The State opposed the motion, arguing that the defendant and the codefendant were both asserting an alibi defense and that the defendant failed to show how these defenses were antagonistic. After hearing arguments, the circuit court denied the defendant's motion for a severance.

¶ 5     The State also filed a motion *in limine*, seeking to admit evidence of the defendant's prior crimes for the purposes of proving identification, intent, motive, and lack of mistake. Specifically, the State sought to introduce evidence of an incident, which occurred approximately three months prior to the events giving rise to the charged offenses, where the defendant and the codefendant invited Avery out to lunch and then led him to a vacant apartment where they held him for ransom at gunpoint. The defendant objected, arguing that the prior incident was not factually similar to the instant offenses, the State was not required to prove motive, and the identity of the perpetrators of the instant offenses was not at issue. The circuit court granted the State's motion and admitted the other crimes evidence for the purposes of proving intent, motive, knowledge, and identification.

¶ 6     At trial, Avery testified that, on November 8, 2013, he arrived at his apartment complex in a Chevrolet Malibu. After he parked in his usual spot, a white sports utility vehicle (SUV) with three occupants pulled directly behind him, blocking his exit. Two men exited the SUV and approached him. Both of the men were armed with a gun and wore a mask and gloves. The men told him to get out of the car and attempted to open his driver side door. He locked his door and then fled out of the passenger door. The smaller of the two masked men pursued him and tackled him in the courtyard of the apartment building. The man then hit him with a hard object in the back of the head and he blacked out.

¶ 7     When Avery came to, the two masked men were attempting to place him, feet first, into their SUV. He struggled to free himself, and the two offenders dropped him. He then saw the third perpetrator, the driver of the SUV, whom he identified as the codefendant. Avery once again attempted to flee, but both of the masked offenders dragged him back to the SUV. The men returned him to the SUV and threatened to kill him. The two men again tried to force him into the SUV. During the struggle, Avery removed the mask off of one of the perpetrators,

whom he identified as the defendant. According to Avery, he had known both the defendant and codefendant for over 20 years and considered them to be his "brother[s]."

¶ 8    Avery continued to struggle with the defendant and the other masked man. He freed himself and attempted to flee but was quickly caught and returned to the SUV. Once there, he heard the codefendant say, "Hurry up. Let's get the fuck out of here. Just shoot him." The defendant, standing approximately a foot away from him, then pointed a silver, automatic "pistol" at his head and said, "I'm going to kill him." Avery testified that the other perpetrator was armed with a black automatic pistol. Avery fled, and this time no one gave chase. As he fled, Avery turned to see the defendant entering his vehicle and driving away.

¶ 9    Avery further testified to a prior incident, during which the defendant and the codefendant held him for ransom. According to Avery, in late August or early September 2013, the defendant and the codefendant invited him to lunch. He arrived at the restaurant in a separate car from the defendant and the codefendant. Once there, the three men drove together to an apartment building. They went inside and entered what Avery described as a "vacant looking" apartment. After he spoke with the defendant and the codefendant for a few minutes, the two men displayed guns, bound him, and directed him to call his fiancée, Camille Colbert. The defendant told him that he would be shot if he did not follow their directions. Avery was instructed to tell Colbert to "give up" everything that he had in their apartment, including cash, jewelry, and the title to a Chevrolet Impala. Avery, who sold drugs, had a bag that contained $100,000 in cash in his apartment. He was then instructed to tell Colbert to leave the bag of money at a nearby restaurant. After the phone call, the codefendant left the apartment. When the codefendant returned, he had with him the duffle bag of cash from Avery's apartment. Avery watched the defendant and the codefendant divide the cash from the duffle bag and then the two discussed whether to kill him or let him go. Eventually, they decided to let him go. Avery did not report the incident to the police due to the illegal source of the money. He eventually told the state's attorney's office about the incident in October 2015.

¶ 10   Colbert, Avery's fiancée, testified that, on November 8, 2013, she looked out from her apartment balcony and saw three men "tussling" outside. One of the men yelled out for help, and she realized that it was Avery. Colbert ran inside and called the police. When she returned to observe the scene, Avery and the other men were standing near a white SUV that was blocking Avery's car. Colbert recognized the defendant as one of the men standing near Avery. She also recognized the codefendant as the driver of the white SUV and heard him say "Pop his ass. Shoot his ass." Colbert saw the white SUV and Avery's car drive away. When Avery eventually returned to the apartment, his clothes were "ripped off." Colbert testified that she had known the defendant and the codefendant for 18 years.

¶ 11   The State published the audio recording of Colbert's 9-1-1 phone call to the jury. During the call, Colbert says that she cannot identify the perpetrators. Later in the call, she identified both the defendant and the codefendant as two of the perpetrators.

¶ 12   Colbert also testified to the prior incident where Avery was held for ransom. According to Colbert, Avery called her that day and told her that he needed her to do something and would call her back shortly. Around this time, Colbert looked outside her apartment window and saw the codefendant walk past. Shortly thereafter, Avery called her back and told her to retrieve a bag hidden in the closet, some jewelry, and the title to her car. He then instructed her to place the bag in the dumpster of a nearby restaurant. Colbert complied but was unable to find the title to her car. She then went to the restaurant, but the dumpster was too visible to the public.

Another individual spoke to her from Avery's phone and directed her to drop the bag at another location, which she did.

¶ 13    The State next presented the testimony of Calumet City detective Randall.[1] Prior to his testimony, the circuit court instructed the jury as follows: "A statement made by one defendant may not be considered by you against any other defendant." Detective Randall testified that he interviewed the codefendant on November 13, 2013. According to Detective Randall, the codefendant denied any involvement in the offense or that he knew either the defendant or Avery.

¶ 14    The State presented the testimony of Chicago police officers Michelle Murphy, Robert McHale, and David Fietko. The officers testified to three separate traffic stops that took place in 2013, during which the codefendant was the driver of the vehicle that was pulled over and the defendant was the passenger.

¶ 15    The circuit court granted the State's motion to introduce its exhibits into evidence, after which the State rested.

¶ 16    The defendant moved for a directed verdict, which the circuit court denied. Neither the defendant nor the codefendant testified on their own behalf.

¶ 17    During closing arguments, both the defendant and the codefendant argued that Avery and Colbert had fabricated the event. In rebuttal, the prosecutor argued the following:

> "And so the defendants have indicated that this is a concocted story. There was no kidnapping. There was nothing that happened here. But it isn't—and [the codefendant] of course in his statement claims he doesn't even know [the defendant]. *** And that's a lie. We know because they were caught riding together. They are like Bert and Ernie."

¶ 18    The jury found the defendant guilty of aggravated kidnapping and aggravated vehicular hijacking. He was sentenced to concurrent terms of 32 years' imprisonment, which included a 15-year enhancement based on the use of a firearm. This appeal followed.

¶ 19    On appeal, the defendant argues the following: (1) the State failed to prove him guilty of either aggravated kidnapping or aggravated vehicular hijacking beyond a reasonable doubt, (2) the circuit court abused its discretion when it denied his motion for a severance, and (3) the circuit court abused its discretion by admitting evidence of the defendant's other crimes.

¶ 20    When considering a challenge to the sufficiency of the evidence, our function is not to retry the defendant. *People v. Wright*, 2017 IL 119561, ¶ 70. Rather, we must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Brown*, 2013 IL 114196, ¶ 48. This means that we must allow all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Reversal is justified only where the evidence is so improbable, unsatisfactory, or inconclusive as to justify a reasonable doubt as to the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 21    The defendant raises three arguments challenging the sufficiency of the evidence. First, he argues that the State failed to prove that he was armed with a firearm during the commission of the offenses. Second, he contends that the State failed to prove that there was asportation and secret confinement of Avery and therefore failed to prove him guilty of aggravated

---

[1]Detective Randall's first name is not contained in the record.

kidnapping. Lastly, the defendant argues that the State failed to prove aggravated vehicular hijacking because the evidence was insufficient to show that he took Avery's car from his immediate person or presence. We address each argument in turn.

¶ 22    To prove the defendant guilty of the aggravated kidnapping and aggravated vehicular hijacking counts as charged, the State was required to establish beyond a reasonable doubt that he possessed a firearm during their commission. See 720 ILCS 5/10-2(a)(6) (West 2012) (aggravated kidnapping); 720 ILCS 5/18-4(a)(4) (West 2012) (aggravated vehicular hijacking). Section 2-7.5 of the Criminal Code of 2012 (Code) (720 ILCS 5/2-7.5 (West 2012)) provides that the term "firearm" has the meaning ascribed to it by section 1.1 of the Firearm Owners Identification Card Act (430 ILCS 65/1.1 (West 2012)), namely, "any device, *** which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," but excluding items such as a "paint ball gun," a "B-B gun," or a "pneumatic gun."

¶ 23    The defendant asserts that the evidence was insufficient to prove that he possessed a firearm within the meaning of the Code where Avery provided insufficient detail regarding the object he saw the defendant holding. We disagree.

¶ 24    Initially, we note that "courts have consistently held that eyewitness testimony that the offender possessed a firearm, combined with circumstances under which the witness was able to view the weapon, is sufficient to allow a reasonable inference that the weapon was actually a firearm." *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 15. As such, the State is not required to present a firearm in order for the trier of fact to find that the defendant possessed one. See *Wright*, 2017 IL 119561, ¶¶ 76-77.

¶ 25    Here, Avery testified to several details about the firearm that he saw the defendant holding, including the fact that it was a silver, automatic pistol. Furthermore, there is circumstantial evidence that suggests that the item the defendant was holding was a firearm within the meaning of the Code. During the incident, Avery heard the codefendant say, "Just shoot him," to which the defendant responded by pointing the gun at his head and saying, "I'm going to kill him." Colbert also testified that she heard the codefendant tell the other perpetrator to "shoot" Avery. *Id.* (finding the evidence sufficient to prove the defendant was armed with a firearm where witnesses testified that the defendant was armed with a "black automatic" gun, an "actual firearm," and a "9 millimeter pistol"). Given this record, we cannot say that the evidence was so improbable, unsatisfactory, or inconclusive as to justify a reasonable doubt that the defendant was armed with a firearm within the meaning of the Code.

¶ 26    The defendant next argues that the State failed to prove him guilty of aggravated kidnapping. The offense of kidnapping may be committed in one of three ways: (1) confinement of the victim, (2) asportation of the victim, or (3) inducement of the victim. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). The indictment charged the defendant with kidnapping under an asportation theory, alleging he "knowingly by force or threat of imminent force carried Antwain Avery from one place to another with intent secretly to confine Antwain Avery against his will *** while armed with a firearm." See 720 ILCS 5/10-2(a)(6) (West 2012).

¶ 27    Here, Avery testified that the defendant and an unknown individual, both of whom were armed with firearms and wearing masks and gloves, attempted to remove him from his car. He fled, and the defendant chased him, tackled him, and struck him over the head with a hard object. Avery awoke, after briefly losing consciousness, to find that the defendant and the other

perpetrator were attempting to place him, feet first, inside their SUV. Illinois courts have "most commonly" found secret confinement when the victim is enclosed in "a house or a car." *People v. Sykes*, 161 Ill. App. 3d 623, 628 (1987). Therefore, viewing the evidence in the light most favorable to the State, we conclude that a rational jury could find beyond a reasonable doubt that the defendant used force and transported Avery with the intention of secretly confining him in his SUV.

¶ 28    Lastly, the defendant argues that the State failed to prove him guilty of aggravated vehicular hijacking. To prove the defendant guilty of aggravated vehicular hijacking, the State was required to establish that the defendant "knowingly took a motor vehicle, from the person or the immediate presence of [Avery], by the use of force or by threatening the imminent use of force" while armed with a firearm. See 720 ILCS 5/18-4(a)(4) (West 2012). The defendant maintains that the evidence was insufficient to establish that he took Avery's car from his immediate person or presence. Specifically, the defendant contends that the evidence established that Avery had fled and was an unknown distance away when he turned around and saw the defendant driving away with his vehicle. Therefore, the defendant did not take the vehicle from Avery's person or immediate presence. We disagree.

¶ 29    The evidence established that, after Avery parked his car, a white SUV pulled up behind him, blocking his exit. The defendant and another perpetrator, both armed and wearing masks, exited the SUV and told him to get out of his car. One of the perpetrators attempted to open the driver side door and Avery quickly locked it. Avery then fled out of the passenger door, but the defendant tackled him and carried him back to the SUV. After multiple failed attempts to flee, Avery finally succeeded, and as he ran, he saw the defendant drive his car away.

¶ 30    The defendant relies primarily on *People v. Cooksey*, 309 Ill. App. 3d 839 (1999), to support his argument. In *Cooksey*, the victim had just exited a mall when she was accosted by the defendant. *Cooksey*, 309 Ill. App. 3d at 842. She tried to run but the defendant caught up with her, stuck "something" in her back, and demanded her car keys. *Id.* The victim gave her keys to the defendant and ran into the mall. *Id.* A short time later, she returned to the parking lot and her vehicle was gone. *Id.* The defendant was convicted of vehicular hijacking and argued on appeal that the State failed to prove that the victim was in the "immediate presence" of the vehicle when it was taken. *Id.* at 846. We found that the driver or passenger must be in the "immediate vicinity of the car" at the time it is taken to constitute "immediate presence." *Id.* at 847-48. We concluded that the State failed to prove the defendant guilty of vehicular hijacking because the undisputed evidence established that at no time did the victim approach her vehicle, she was 25 feet away from it when the defendant first jumped her, and she fled away from the vehicle, not toward it. *Id.* at 848.

¶ 31    Unlike in *Cooksey*, at the time the hijacking began in the instant case, Avery was inside of his vehicle and, therefore, it was within his immediate presence. Moreover, although the record is silent with regard to how far Avery was when the defendant ultimately drove off with his car, it was not unreasonable for the trier of fact to infer that he was within 25 feet given the circumstances. Lastly, the defendant and the codefendant had demanded the title to Avery's Impala as ransom during their previous kidnapping of him, which supports the inference that it was their intention from the start to take the car. Put simply, the instant facts align with the specific ill that the legislature intended to address when it enacted the vehicular hijacking statute. See *id.* at 847 ("[I]t is clear that the vehicular hijacking statute was enacted to combat the 'tragedies *** of car hijacking where someone armed or unarmed attacks a car, and ***

snatches the driver out ***.' " (quoting 88th Ill. Gen. Assem., Senate Proceedings, Apr. 15, 1993, at 281 (statements of Senator Hawkinson))). As such, we conclude that a reasonable jury could find that this evidence, and the reasonable inferences therefrom, proved beyond a reasonable doubt that the defendant took Avery's car from his person or immediate presence.

¶ 32 The defendant next contends that the circuit court abused its discretion when it denied his motion for a severance.

¶ 33 A defendant does not have an automatic right to be tried separately from a codefendant merely because they were charged in the same indictment for crimes arising from the same circumstances. *People v. Bean*, 109 Ill. 2d 80, 92 (1985). The long-established general rule in Illinois is that defendants who are jointly indicted are to be jointly tried unless fairness requires a separate trial to avoid prejudice to one of the defendants. *Bean*, 109 Ill. 2d at 92. Prejudice occurs under the following circumstances: (1) when statements made by a codefendant implicating the defendant are admitted at trial, but the defendant is unable to cross-examine the codefendant because he does not testify, or (2) when the codefendants' defenses are so antagonistic that, when tried jointly, one codefendant cannot receive a fair trial. *People v. Olinger*, 112 Ill. 2d 324, 345 (1986); *Bean*, 109 Ill. 2d at 93. The defendant argues the first scenario existed here because the State admitted a statement made by the codefendant and he did not testify at trial.

¶ 34 To begin, we note that, although the defendant raised this issue in his posttrial motion, he did not raise this particular issue in either his motion for a severance prior to trial or in a contemporaneous objection. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (objection both at trial and in a posttrial motion is required to preserve an issue for appeal). He nevertheless argues that this court should consider the matter pursuant to the plain-error doctrine. We disagree.

¶ 35 A reviewing court considers unpreserved error under plain-error review when either of the following circumstances is present: (1) the evidence at trial was so closely balanced that the guilty verdict may have resulted from the error or (2) the error was so serious that it deprived the defendant of a fair trial. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). Absent an error, there can be no plain error under either prong. *Id.*

¶ 36 In *Bruton v. United States*, 391 U.S. 123, 127-28 (1968), the United States Supreme Court held that the admission of a codefendant's statement inculpating the defendant during a joint jury trial violates the confrontation clause of the sixth amendment. See also U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***."). Our supreme court has likewise held that "with limited exceptions, defendants should not be prejudiced by the admission of incriminating extrajudicial statements of nontestifying codefendants." *People v. Duncan*, 124 Ill. 2d 400, 415 (1988). Therefore, our first duty is to determine whether the codefendants statement incriminated the defendant in the charged offenses. We conclude that it did not.

¶ 37 The record shows that, prior to Detective Randall's testimony, the circuit court instructed the jury that any statement made by the codefendant could not be used against the defendant. Detective Randall went on to testify that, during his interview with the codefendant, he denied knowing the defendant or Avery. Simply put, this statement does not incriminate the defendant in the charged offenses in any manner, either explicitly or implicitly. Nor did the State use the statement to argue that it implicated the defendant. Rather, during its rebuttal, the State used the codefendant's statement exclusively against the codefendant to argue that he was

untruthful. The prosecutor said the following: "And [the codefendant] in his statement claims he doesn't even know [the defendant]. *** And that's a lie. We know because they were caught riding together. They are like Bert and Ernie." To the extent that the State used the codefendant's statement during trial, the record shows that it was only used to discredit the codefendant as untrustworthy. As such, its admission did not violate the defendant's rights under the confrontation clause and, as the circuit court committed no error, there can be no plain error. *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010).

¶ 38    The defendant's final contention is that the circuit court abused its discretion when it admitted evidence of the defendant's other crimes. Specifically, the defendant argues that the circuit court abused its discretion in allowing evidence that he and the codefendant had previously kidnapped Avery and held him for ransom because it was admitted to show he had a propensity to commit crimes.

¶ 39    The State responds by arguing that the evidence was not used to show propensity but rather to prove identity, intent, and motive. We agree with the State.

¶ 40    Evidence of other crimes, wrongs, or bad acts is not admissible to prove a criminal defendant's criminal propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Evidence of other crimes, however, is admissible for any other purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In addition, the offering of other-crimes evidence may be admissible when it " 'constitutes a continuing narrative of the circumstances attending the entire transaction.' " *People v. Evans*, 373 Ill. App. 3d 948, 958 (2007) (quoting *People v. Carter*, 362 Ill. App. 3d 1180, 1189 (2005)). However, even when such evidence is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value. *People v. Pikes*, 2013 IL 115171, ¶ 11. A circuit court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Peterson*, 2017 IL 120331, ¶ 125.

¶ 41    In this case, the record shows that the circuit court granted the State's motion *in limine*, allowing the State to introduce evidence of the defendant's prior kidnapping of Avery for the purpose of showing identity, intent, and motive. We find that the prior kidnapping of Avery was highly relevant to establish the motive of the defendant in targeting Avery. According to Avery, he had known the defendant and the codefendant for over 20 years. Without the prior kidnapping incident, the trier of fact might be left to wonder what would motivate two men, whom Avery considered his "brothers," to kidnap him and hijack his car. As the evidence of the prior kidnapping established, the defendant and the codefendant successfully held Avery for ransom just a few months prior to the charged offenses. Thus, the other-crimes evidence was highly relevant to establishing that the defendant's and the codefendant's motive, from the beginning, was to once again kidnap Avery and hold him for ransom. Additionally, the prior kidnapping also established that the defendant and the codefendant specifically targeted Avery's Chevrolet Malibu, as they had previously demanded the title to Colbert's car as part of the ransom, which again speaks to their motive in carrying out the charged offenses. In short, the evidence of the defendant's other crimes was highly probative of his motive for both the kidnapping and hijacking. See *People v. Heard*, 187 Ill. 2d 36, 59 (1999) (holding that evidence of the defendant's continued hostility and animosity toward his ex-wife and her new boyfriend was admissible to prove the defendant had motive to murder them). Because we cannot say, as a matter of law, that the probative value of the other-crimes evidence was substantially

outweighed by the danger of unfair prejudice, we find no abuse of discretion in the admission of the evidence of the defendant's prior kidnapping of Avery.

¶ 42        For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 43        Affirmed.