THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DEBBIE BLOMMAERT, Defendant-Appellant.

Third District No. 3—88—0525

Opinion filed June 9, 1989.—Modified on denial of rehearing July 11, 1989.

Schenk, Duffy, Quinn, McNamara, Phelan, Carey & Ford, Ltd., of Joliet (Joseph R. Mazzone, of counsel), for appellant.

Edward F. Masters, State's Attorney, of Joliet (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Debbie Blommaert, was charged with first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)) following the death of her adopted baby, Amy, who was nearly 10 months old at the time of her death. When Amy was admitted to the hospital on October 12, 1987, she was suffering from hemorrhaging within her skull. She lapsed into a coma and died four days later. The defendant was convicted following a jury trial and was sentenced to a 20-year term of imprisonment. She appeals her conviction, and we affirm.

Much of the medical testimony presented at trial was conflicting, and the record in this case is voluminous. Accordingly, the summation of the relevant proceedings and evidence is of necessity somewhat lengthy.

Prior to trial, the court heard extensive arguments regarding the admissibility of certain evidence of alleged prior abuse Amy suffered. Counsel discussed numerous bruises and scars and how they might have been sustained, as well as a collarbone fracture which the baby suffered at the age of 16 weeks. The court ruled that the evidence would not be admissible unless the State was able to show that the defendant inflicted the injury.

Deputy Gary Kraemer of the Will County sheriff's office testified that he interviewed the defendant on October 14, 1987. The defendant told Kraemer that she and her husband adopted Amy on March

23, 1987, and that the baby was healthy at that time. She told him that the baby had recently been crabby and vomited several times. She stated to the witness that on October 12, at approximately 3 or 4 in the afternoon, she and the baby were in the kitchen about 10 feet from one another and the baby pulled herself up to a kitchen chair. Amy began chewing on a tie which secured the seat cushion to the chair. Next, the defendant told Kraemer, she heard the baby cry, looked over, and saw her lying on her back on the kitchen floor. Kraemer stated that the defendant told him she did not hear or see the baby fall. At this time, the defendant's husband was at work and the defendant's four-year-old son was outside playing. The defendant indicated to Kraemer that she took the baby into the family room, and Amy became quiet.

Kraemer further testified that the defendant told him her husband arrived home at 4:15 or 4:30. He checked the back of Amy's head at the defendant's request and after she explained that the baby had fallen earlier, but neither of them felt anything unusual. At approximately 7:30 that evening, Kraemer was told in the interview, the baby became limp and apparently lost consciousness as the defendant carried her downstairs after changing her diaper. After the defendant and her husband unsuccessfully attempted to revive Amy, they called their neighbor, who was a nurse. The neighbor continued resuscitative efforts until Amy was transported to the hospital.

Dr. Mitra Kalelkar, an assistant Cook County medical examiner who performed an autopsy on Amy, also testified. She stated that she noted the existence of several fresh bruises on Amy's face, left buttock, and back. In her opinion, the bruises occurred approximately four to five days before the baby died, and only two of them might have occurred as a result of medical treatment such as cardiopulmonary resuscitation (CPR).

Dr. Kalelkar further testified that during the autopsy, she discovered the baby had two hemorrhages in the subgaleal area, that is, in the inner scalp. The larger hemorrhage measured 2½ inches in diameter and the smaller hemorrhage measured one inch in diameter, and they were located in the occipital region, which is in the back of the head, toward the neck area. The witness testified that blunt trauma caused each hemorrhage, but that they were separate injuries and resulted from separate blows.

Dr. Kalelkar testified that beneath the larger subgaleal hemorrhage, she then discovered a lineal vertical skull fracture measuring seven-tenths of an inch in the left occipital bone. She indicated that

in her opinion, the fracture was caused by the same blow or blows that caused the larger hemorrhage. After the baby's skullcap was removed by an autopsy technician, Dr. Kalelkar observed a large, fresh subdural hemorrhage on the right side of the brain, toward the back. She also observed an older subdural hemorrhage at the base of the skull on the right and left sides of the brain. She explained that the subdural space lies between two of the membranes covering the surface of the brain. The doctor testified that the baby's injuries were consistent with the head being in motion and striking a stationary object, and further stated that the baby died as a result of cranial cerebral injuries which were sustained as a result of blunt trauma. During the witness' testimony, slides taken before and during the autopsy were shown, and the witness pointed out the injuries. Dr. Kalelkar testified that in her opinion, based on a reasonable degree of medical certainty, a nine-month-old baby sustaining a backwards fall to a tile floor would not sustain a skull fracture and subdural hematomas such as Amy did. Finally, Dr. Kalelkar stated that a baby sustaining subdural hematomas such as those observed would lapse into a coma in a matter of four or five hours.

On cross-examination, Dr. Kalelkar acknowledged that it was possible that the baby sustained the bruises in an accidental manner, but that it was unlikely. She also stated that she saw no evidence that Amy was grabbed or held with great force. Defense counsel established that the witness testified at an earlier proceeding that the bruises on Amy's body could have been anywhere from several hours to two or three days old.

David Gilles, a Will County deputy sheriff, testified that he was present when Dr. Kalelkar performed Amy's autopsy. He stated that when Amy's skull was exposed, the doctor pointed to a thin red line and indicated it was a fracture. After the technician removed the skullcap, Dr. Kalelkar held it up and manipulated the fracture back and forth.

Charlotte Clark, a registered nurse, testified that Amy's right eyelid was swollen and discolored when she was brought to the emergency room for treatment.

Next, Mary Ann Burton Lewin testified that on October 28, 1987, in the course of her employment as a social worker, she had a conversation with the defendant. Lewin testified that the defendant described Amy as an irritable child who got worked up and upset to the point of throwing up. The defendant also told Lewin that for several days before Amy lapsed into the coma, she had been irritable, cried often, vomited several times, and repeatedly placed objects in

her mouth as if she were teething. The witness noted that the defendant did not describe any positive qualities the child may have possessed.

Pamela Vraney, a neighbor of the defendant's, was allowed to testify over defense objection. The court informed the jury that it should consider her testimony for the purpose of establishing the defendant's intent or absence of mistake with regard to Amy's death. Vraney testified that on June 26, 1987, her husband noticed a hole in their above-ground pool and directed her to go to the Blommaerts' residence and bring back four-year-old Justin Blommaert, whom he suspected may have helped create the hole. After she explained this to the defendant, Vraney remained in the Blommaerts' kitchen from where she heard the defendant go to the upstairs bathroom to inquire about the incident. Vraney testified that after Justin admitted putting a hole in the pool, the defendant began to yell and to beat him, and she heard the defendant slap him more than 10 times. Vraney said the defendant then brought the boy downstairs, clad only in his underwear, and "flung" him about 10 feet across the linoleum floor. Next, Vraney said, the defendant carried Justin to the swimming pool, threw him to the ground, and yanked and pushed him until he demonstrated what he had done. On cross-examination, Vraney stated that in the year she had known the Blommaerts, she had never seen the defendant act in any manner other than as a good mother. She also testified that she did not observe any welts or bruises on Justin after this incident.

The defendant then presented her case in chief. She presented three doctors who observed and examined Amy on either October 12 or 13 while she was in the hospital, and all testified that they observed no bruising on Amy's body.

The defendant also called Dr. Mitra Kalelkar. The doctor stated, as she had in her earlier testimony, that it was possible that the bruises on Amy's body could have been the result of accidents. She testified that the baby sustained the subgaleal hemorrhages at almost the same point in time, but admitted that they may have been inflicted up to a week apart. Dr. Kalelkar stated that there was no indication that the older subdural hematoma rebled and caused the newer hematoma, and further that old subdural hematomas do not usually rebleed in children.

On cross-examination, Dr. Kalelkar stated that the skullcap contains blood vessels, and if it fractures while the individual is alive, there will be a minute amount of bleeding along the fracture line. There will be no bleeding along the fracture line if the skullcap is

fractured after death. While viewing a slide of the fracture she observed in Amy's skullcap, the doctor noted the red line in the fracture, which indicated the fracture was not created postmortem. The witness again stated that in her opinion, the fall described by the defendant was not sufficient to create the subdural hematomas or the skull fracture Amy suffered.

Debbie Blommaert took the stand in her defense. She testified that on July 21, 1987, while in Chicago in the company of her family and the attorney who helped them adopt Amy, she tripped and fell forward with the baby in her arms. The defendant stated that the right rear portion of Amy's head struck the concrete. The baby cried briefly but displayed no injuries, so the Blommaerts did not seek medical attention. The parties later stipulated that if he were called, the attorney would testify that he observed the defendant trip and fall, and that Amy hit the concrete and cried for several minutes. The defendant repeated the version of events she earlier told to Deputy Kraemer regarding Amy falling in the kitchen and later losing consciousness.

On cross-examination, the defendant testified that October 12 was the first time Amy had fallen and struck anything in the kitchen. The prosecutor then inquired whether in May of 1987, the defendant fainted in the kitchen while carrying Amy, causing Amy to fall and strike a chair or table leg and sustain a large facial bruise. The defendant denied this and stated she did not faint. On redirect, the defendant testified that in May of 1987, she had been applying water sealant in her basement while her gas dryer was operating, when Amy awoke from her nap. The defendant stated she got Amy and was coming downstairs with her when she became dizzy in the kitchen. The defendant testified she tried to sit on the kitchen floor so she did not fall with Amy, but she fell a little forward and, as a result, Amy hit the side of a chair and bruised her face.

Dr. Larry Blum, a forensic pathologist, conducted an autopsy on Amy on January 25, 1988. He testified that all of the bruises he observed could have been caused by the efforts to resuscitate Amy. After looking at a photograph of Amy's skull, Dr. Blum testified that the line alleged by Dr. Kalelkar to be a fracture may or may not be a fracture, and even if it were, it was a fracture of the parietal bone, not the occipital bone as Dr. Kalelkar stated. He testified that small linear fractures in the parietal area are consistent with falls, and that accidental injury is more likely to occur in the parietal area rather than in the occipital area. He further stated that the larger subgaleal hemorrhage and the fracture could have been caused by

the baby falling backwards.

Dr. Blum testified that the baby might have sustained the older subdural hematoma when the defendant fell with her in July of 1987. According to Dr. Blum, as part of the healing process of these hematomas, new blood vessels with thin walls form, and the hematoma might rebleed spontaneously or after only slight trauma. If a hematoma rebleeds, the blood flow puts pressure on the brain and the result is respiratory arrest and brain death unless the patient is placed on a respirator and the swelling in the brain is decreased. He opined that if a baby fell from a standing position and struck her head on the floor, there would be enough force to cause the rebleeding of a chronic subdural hematoma, and that is what occurred in this case. Finally, he stated that based upon a reasonable degree of medical certainty, it is entirely possible that the injuries that resulted in the victim's death were accidental.

On cross-examination, Dr. Blum acknowledged that it was possible that the bruises on the baby's body were of a nonaccidental nature. The witness agreed that the existence of a skull fracture accompanied by a subdural hematoma indicated a blow of considerable force. He stated that when he performed the autopsy, he did not observe the .7-inch linear skull fracture Dr. Kalelkar located, and he based his opinion as to the cause of death on his own findings. However, he testified that the existence of the skull fracture did not alter his opinion regarding cause of death.

In rebuttal, the State called Pamela Vraney, who testified that in May of 1987, she noticed a bruise on Amy's face. She stated that the defendant told her she had fainted in the kitchen while carrying Amy and that the baby must have hit the table or the chair leg. Vraney said the defendant told her she was going to see a social worker from the adoption agency in a few days and was worried the social worker would see the bruise.

The State called Dr. Haller, a neuropathologist, who examined Amy's brain and spinal cord and reviewed the autopsy reports of other physicians. She testified that old subdural hemorrhages rebleed more frequently in adults than in children. She also stated that the fall described by the defendant would not generate enough force to create the fracture Amy sustained, whether the fracture was to the occipital bone or the parietal bone. Further, the doctor opined that the force of such a fall was not sufficient to cause the old subdural to rebleed.

The State also called Dr. Mary Ann Radkowski, whose specialty is pediatric neuroradiology. After viewing several CAT scans of

Amy's head and neck, the doctor testified that the old subdural hematoma did not rebleed into the area of the fresh hematoma. She explained that tremendous force would be required to cause a subdural hematoma in the area where the fresh hematoma was located, and that the hematomas were in different compartments of the brain and bleeding does not usually spread outside the compartment. The witness also testified that blood had collected in the subarachnoid space outside Amy's brain and in the ventricles, which are sac-like structures containing cerebral-spinal fluid in the brain. She opined that rebleeding of an old hematoma did not cause the collection of blood, but that it was the result of severe trauma. Dr. Radkowski further testified that a fall on a linoleum floor would not generate enough force to cause the injuries suffered by the baby in this case.

Dr. Robert Kirschner, the deputy chief medical examiner in Cook County, testified over defense objection. He testified that a fall such as that Amy experienced would not create a skull fracture, bleeding in the subarachnoid space, or bleeding in the ventricles. He stated that such injuries would result from severe blunt head trauma. The doctor observed the autopsy while it was being done and testified that he observed a fracture of the parietal bone in the left occipital region of the skull. In his opinion, the fall did not cause the old subdural to rebleed, and even if it had, it would be unlikely to have caused death.

On cross-examination, Dr. Kirschner acknowledged that the fracture was not in the occipital bone as Dr. Kalelkar stated in the autopsy protocol. He also stated that several studies have determined that when a skull fracture and subdural hematoma are present in a child Amy's age, statistically, the chances of the injuries being caused by abuse are 95%. The doctor stated that the degree of brain injury Amy suffered is far out of proportion to what would occur from a rebleeding of a subdural hematoma.

In surrebuttal, Dr. Blum testified that Dr. Kalelkar's autopsy protocol made no mention of bleeding in the ventricles or subarachnoid space. He repeated that in his opinion, a fall sustained by a baby with a chronic subdural hematoma could result in rebleeding of the hematoma and death. The doctor stated that the older hematoma was in a stage of healing which made it highly susceptible to rebleeding, and that removal of fluid from the area could cause further subdural bleeding. He also acknowledged that the fluid removed from the area where the older subdural hematoma was located did not indicate rebleeding.

Following the presentation of the evidence, the defendant's mo-

tion for directed verdict was denied and the case went to the jury. The jury found the defendant guilty of murder, and she was sentenced to a term of 20 years' imprisonment. This appeal followed.

The defendant contends it was error for the trial court to allow the State to present evidence of prior acts of abuse directed against the victim and the defendant's son, even though the court instructed the jury that the evidence was to be considered only to establish the defendant's intent or the absence of accident or mistake with regard to the baby's death. Specifically, the defendant argues that it was improper for Pamela Vraney to testify about the defendant's treatment of Justin during the pool damage incident, and it was improper for the State to inquire of her about the facial bruise the baby sustained several months earlier and the defendant's explanation for the manner in which it was sustained.

■■ Evidence of other crimes, wrongs, or acts is inadmissible if it only tends to establish the defendant's propensity to commit crimes. (*People v. Milner* (1984), 123 Ill. App. 3d 656.) Such evidence is admissible for numerous other purposes, such as proof of motive, intent, knowledge, or absence of mistake or accident. Evidence of other acts or crimes may thus be received, if relevant, for any purpose other than to show mere propensity unless the court determines the probative value of the evidence is substantially outweighed by the risk that admission will unduly prejudice the defendant. (*People v. Groleau* (1987), 156 Ill. App. 3d 742.) The trial court's decision with respect to admissibility of other crimes evidence will not be overturned unless there is a clear abuse of discretion. *People v. Funches* (1978), 59 Ill. App. 3d 71.

■■ The defendant argues that Pamela Vraney's testimony was irrelevant, about a remote incident, and served only to inflame the jury. We disagree. The testimony regarding the defendant's abusive actions toward Justin provided information about the defendant's temperament and her previous reactions when a child of hers frustrated or angered her, and it was therefore relevant. The uncharged incidents of abuse were also relevant to prove the defendant's intent and to establish lack of mistake or accident. As the State noted, there are often no eyewitnesses to acts of child abuse, which renders it difficult to identify through direct evidence the perpetrator or the exact cause of death. Instead, guilt must often be established through circumstantial evidence which may include proof of a pattern of repeated beatings or injuries. Accordingly, under the totality of the circumstances presented, we cannot say that the trial court's decision to admit the evidence of other acts or wrongs was a clear

abuse of discretion. Furthermore, Pamela Vraney's testimony that the defendant told her that Amy's face was bruised because she fainted in the kitchen while carrying the baby was elicited in response to the defendant's denial that she fainted in the kitchen. Thus, Vraney's testimony about the defendant's explanation of her fainting and the bruise Amy sustained was proper impeachment.

The defendant also contends that the court erred when it precluded her from impeaching Pamela Vraney by introducing evidence of litigation pending between their respective husbands. In an offer of proof, Vraney testified that Ron Blommaert, the defendant's husband, performed unsatisfactory masonry work on the Vraney home and, as a result, Vraney's husband filed a civil lawsuit and a complaint with the Attorney General's office. Vraney admitted that she prepared and filed the necessary papers, but did not sign them because she had school-age children and might not be able to appear in court. She further stated that she and her husband had been friends with the Blommaerts, but they no longer had any relationship, good or bad. The court refused to allow the defendant to introduce this evidence during Vraney's cross-examination, and the defendant contends this ruling improperly limited her right to establish bias or interest on the part of the witness.

■■■ In criminal proceedings, the accused has the right to question a witness concerning matters which explain, qualify, discredit, or destroy what he or she said on direct examination. Although the scope of cross-examination is generally within the trial court's sound discretion, the widest latitude should usually be allowed the defendant on cross-examination for the purpose of establishing bias, interest, or motive. (*People v. Gonzalez* (1984), 104 Ill. 2d 332.) We agree with the defendant that she should have been permitted to question Vraney about the pending litigation and the claim filed with the Attorney General. Even though the witness did not sign the documents, the fact that she prepared them for her husband's signature and that she acknowledged her friendship with the Blommaerts had terminated as a result of the dispute indicates that this is a matter which might have colored her testimony. Therefore, inquiry into this matter should not have been foreclosed.

Improper restrictions on the scope of cross-examination constitute reversible error only if there was a clear abuse of the trial court's discretion which resulted in a manifest prejudice to the defendant. (*People v. Larson* (1980), 82 Ill. App. 3d 129.) We find that the undue restriction on the witness' cross-examination in this case does not rise to the level of reversible error. The defendant was

otherwise given wide latitude in her cross-examination of this witness, and her testimony established that she was upset about the damage to their pool and the Blommaerts' refusal to pay for the damage. While introduction of evidence regarding the lawsuit and the claim with the Attorney General would have been proper, we find the trial court's decision to exclude that evidence did not result in manifest prejudice to the defendant.

Furthermore, as is often stated in Illinois law, a defendant is entitled to a fair trial, not a perfect one. (*People v. Jackson* (1986), 145 Ill. App. 3d 789, 795.) A conviction will not automatically be reversed merely because error was committed at trial, because trial error may be harmless if it is inconsequential or if it appears that it did not affect the outcome of the trial. (*People v. Hunter* (1984), 124 Ill. App. 3d 516.) On review, the appellate court's purpose is not to determine whether the record is completely free from error, but whether any error occurred which prejudiced the defendant or which unduly affected the outcome below. (*People v. Miles* (1986), 151 Ill. App. 3d 485.) Upon a careful review of the record, we find that any error was harmless beyond a reasonable doubt, and neither reversal of the defendant's conviction nor a new trial is required. *People v. Foley* (1982), 109 Ill. App. 3d 1010.

The defendant's next assignments of error arise out of events which took place after the evidence was heard and prior to the rendering of the verdict. Judge Penn, who presided over the trial, informed the jury after closing arguments were made that he was late for a prior commitment and that Judge Bolden would therefore instruct the jury as to the law. During the course of its deliberations, the jury sent a note requesting that the autopsy slides which had been admitted into evidence be provided for further review. After hearing the arguments of counsel, Judge Bolden sent the slides and a projector to the jury room. The defendant now claims she was denied a fair trial because Judge Penn inexplicably absented himself from the courtroom, which prejudiced the jury, and because Judge Penn's absence caused Judge Bolden to make an erroneous decision to submit autopsy slides to the jury, which served no purpose other than arouse the jury's passion and prejudice. We disagree with both of the defendant's allegations.

Judge Penn did not inexplicably absent himself and leave the courtroom unsupervised. Rather, after he heard all the evidence and arguments and ruled on jury instructions, he informed the jury that he had a prior commitment and left Judge Bolden to read the jury instructions. The cases cited by the defendant are not relevant be-

cause in those cases, the trial judges left the courtroom during closing argument and the proceedings continued unsupervised, while in the case before us, Judge Bolden presided over the proceedings after Judge Penn departed. The defendant admits that Judge Penn's absence had an unknown effect on the jury, but presumes it somehow prejudiced the jury. There is no indication in the record that the change in judges affected the jury and there is no reason to presume prejudice in this situation. We find there was no reversible error.

The defendant contends Judge Bolden's decision to allow the autopsy slides to go to the jury was prejudicial and constituted fatal error. She asserts that the slides were graphic and inflammatory, and that the only purpose for submitting them to the jury was to confuse, inflame, and prejudice the jurors. Again, we disagree.

 █ The allowance of exhibits to be taken to the jury room during deliberations is within the sound discretion of the trial court. (*People v. Montague* (1986), 149 Ill. App. 3d 332.) In reaching its decision, the trial court is to balance the probative value against any prejudicial effect, and the decision will not be disturbed on appeal absent an abuse of the court's discretion. (*People v. Williams* (1983), 97 Ill. 2d 252.) The slides in this case were graphic depictions of autopsy proceedings; however, they tended to establish the cause of death, the possible use of force, as well as the existence and location of the baby's wounds. The slides had been shown to the jury and admitted into evidence, and they corroborated and explained the extensive and often conflicting medical testimony. Furthermore, the slides were submitted to the jury only in response to a written request from the foreman. It was well within the trial court's discretion to allow these slides to be sent to the jury room during deliberations.

Finally, the defendant urges this court to find she was not proved guilty beyond a reasonable doubt of the offense of first degree murder. Specifically, she asserts that several of the State's witnesses were biased, that they were impeached during cross-examination, that they disagreed on the location of the baby's skull fracture, and often could not support their opinions with references to scientific literature. She also contends the State failed to prove she was the only one present when the fatal blow was inflicted and further failed to rebut her theory of defense, that the baby's fall on the kitchen floor on October 12 caused the old subdural hematoma to rebleed.

The evidence against the defendant in this case was solely circumstantial, so in order for this conviction to be sustained, her guilt must be so thoroughly established as to exclude every reasonable hypothesis of innocence. (*People v. Garrett* (1975), 62 Ill. 2d 151, 163.)

That is, the circumstantial proof must be of a conclusive nature tending to establish that the accused and no one else committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478.) As is often stated, it is the function of the trier of fact to pass upon the question of the guilt or innocence of the accused, and in cases where the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact to ascertain the truth. (*People v. Hammond* (1970), 45 Ill. 2d 269.) When presented with a challenge to the sufficiency of the evidence, a court of review does not retry the defendant, but determines only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

■■ From a careful and thorough consideration of all of the evidence in this case, we are unable to say that there is a reasonable doubt as to the guilt of the accused or that the evidence failed to exclude every reasonable hypothesis of innocence. The conflicts in testimony and the issue of witness credibility were for the jury to resolve, and neither the defendant's personal attacks on the State's witnesses nor the citation to selected portions of the evidence leads this court to conclude that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The verdict of the jury is supported by the evidence in the record. The trial court found no fault with the verdict and denied the defense motion for judgment notwithstanding the verdict. Our review of the record discloses no errors necessitating reversal.

Based on the foregoing, the judgment of the circuit court of Will County is affirmed.

Affirmed.

WOMBACHER, P.J., and SCOTT, J., concur.