THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES WASHINGTON, Defendant-Appellant.

First District (1st Division)   No. 1—87—1311

Opinion filed December 31, 1992.

Rita A. Fry, Public Defender, of Chicago (Millicent Willis, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Bennett E. Kaplan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

The defendant, James Washington, was convicted in a bench trial of aggravated criminal sexual assault and sentenced to 10 years' imprisonment. He appealed the conviction and this court, with one justice dissenting, reversed and remanded the case because it believed defendant was denied effective assistance of counsel. The State filed a petition for leave to appeal that was granted by the Illinois Supreme Court. Thus, this case comes before us on remand from the Illinois

Supreme Court (see *People v. Washington* (1991), 142 Ill. 2d 663, 582 N.E.2d 183), wherein a supervisory order was entered vacating the judgment of the appellate court with directions to reconsider our decision in light of the decision in *People v. Szabo* (1991), 144 Ill. 2d 525, 582 N.E.2d 173.

Upon reconsideration and having read supplemental briefs of the parties and heard oral argument, we now affirm the conviction and sentence herein. Numerous arguments were raised in the original appeal. However, this court initially ruled on the basis of ineffective assistance of counsel and, hence, did not address any of the additional issues. We now must do so.

Defendant raises the following issues on appeal: (1) he received ineffective assistance of counsel where disciplinary proceedings were simultaneously pending against his defense counsel; (2) he was not proven guilty beyond a reasonable doubt where the victim's testimony was neither corroborated nor clear and convincing; and (3) the trial court considered improper factors in determining the defendant's guilt. We find that each of these contentions lacks merit.

While the facts in great detail are set forth in the original appellate court opinion (*People v. Washington* (1990), 210 Ill. App. 3d 147, 568 N.E.2d 1279), we shall here recount the details of the occurrence in sufficient detail to understand the additional issues raised and the law applicable thereto.

The following facts were presented at trial. The victim testified for the State that upon the recommendation of a person known as Cordell, she and her boyfriend, on May 29, 1986, rented a room from the defendant for which they paid him $30 for 30 days. The room was located in the same apartment in which defendant resided. Prior to renting the apartment, the victim stated that she had never met defendant before, nor had she, or her boyfriend to her knowledge, ever seen the apartment prior to the rental. They were initially given one key to the apartment, but subsequently had two keys made. Their first night in the apartment, she and her boyfriend slept on a queen size bed with only a box spring. The second day they shopped for food, took the groceries to the apartment and refrigerated them and then left the apartment. They went out drinking and consumed four bottles of wine. Upon returning to the apartment, they found the apartment locked behind burglar bars. While waiting to gain entrance, some of the defendant's friends arrived at the door, were let in and the victim and her boyfriend entered also at that time. However, upon seeing the victim and her boyfriend, the defendant requested that they leave the apartment. A fight ensued between

defendant and the victim's boyfriend at which time the defendant took the apartment key from him and then tore his pants with a knife trying to find money. The defendant searched the victim in the kitchen after which she went into the living room and sat on the couch next to her boyfriend.

The victim testified that she went to the bathroom at which time the defendant followed her. Once in the bathroom the defendant directed her to take off her pants which she declined to do. He then struck her in the head with a wine bottle and then ordered her to take the pants off. Once more, she refused. Defendant then cut her on the side of her back with the broken wine bottle. She then removed her pants and lay on the floor as told. Defendant then removed his pants, proceeded to sexually assault her, both vaginally and orally, until he ejaculated. He then left the bathroom and she followed shortly thereafter. They both went to the living room, where she saw her boyfriend sitting on the floor surrounded by five people. Eventually these individuals began threatening the victim and her boyfriend, and the defendant allowed them to leave the apartment. After leaving the apartment, the victim related to her boyfriend what had transpired in the bathroom. They went to a public telephone booth and called the police. The police arrived and transported the victim to Michael Reese Hospital for treatment. The victim further testified that while at the hospital, she gave her boyfriend the key to defendant's apartment in order for him to accompany the police back to defendant's apartment. She denied that she was having a menstrual period on the day of the incident.

Paul, the boyfriend, testified to basically the same facts as the victim with a few differences. He recalled that upon being told about the apartment by Cordell, he, the victim and Cordell went to look at the apartment. He also described the bed that they slept in the first night as being "a little less than full size." He remembered hearing "pounding and scuffling" noises on the door and walls of the bathroom while the victim and the defendant were in the bathroom, and he was kept in the living room by the defendant's friends upon defendant's instructions to them. He noticed that the victim's head and hands were bleeding when she came out of the bathroom and he also observed a large spot of blood on the back of her blouse. He and the victim called the police upon leaving the apartment, and the police arrived and transported the victim to the hospital. He accompanied the police back to the defendant's apartment and gave them the key which the victim had given him at the hospital. The police opened the door of the apartment and arrested the defendant.

The parties stipulated that, if Dr. Gordon of Michael Reese Hospital were called to testify, he would state that when he examined the victim at the hospital, he noticed a .3-centimeter puncture wound on the left side of the back and a swollen laceration on her head. He would further testify that he took oral and vaginal smears from the victim which he gave to an evidence technician. It was also stipulated that Dr. Gordon would testify that when he examined the victim, she was found to be in the late stage of her menstrual cycle and upon the taking of a blood sample, her blood-alcohol level was 293 milligrams. It was further stipulated that if Mary Ann Caporusso, a microanalyst for the Chicago police department, were called to testify, she would state that upon performing a test on the oral and vaginal smears, the oral smear tested negative for spermatozoa and semen and the vaginal smear tested positive for spermatozoa.

Defendant's testimony revealed that he was a recovering alcoholic and he contended that he had never met the victim until May 30, 1986, when she approached him as he was leaving Alco drugstore and solicited him for a date. He stated that she was accompanied by Paul. He told her that he did not have enough money, but that there were others at his apartment who might be interested in putting together a "package deal." She accompanied him to his apartment, they began drinking and she began talking "in riddles." Thereafter, Paul arrived at the apartment and angrily took the victim to the bedroom, where he and she fought. The defendant testified that he went into the bedroom, broke up the fight, and noticed that her face appeared to be bleeding. After the victim and Paul left the apartment, the defendant noticed that his door key and wallet were missing. Defendant denied that he had rented a room to the victim and Paul and that they had spent the night in his apartment. Defendant further denied having sex with the victim because she was drunk and could not establish a price. Defendant testified that he receives disability insurance because his left hand has been paralyzed for three years and, as a result of the paralysis, he does not have any strength in the left hand. Defendant also testified that after he had gone to bed on the night in question, the police entered his apartment with a key and searched the apartment. The police did not recover any broken bottles and they did not discover any blood.

Detective Robert Utter testified that he was assigned to investigate the rape of the victim. He went to defendant's apartment accompanied by Paul to arrest defendant. He was unable to find any broken glass on the bathroom floor, and he observed the defendant take out his keys and wallet when he put on his trousers. Detective Utter fur-

ther testified that defendant resisted the arrest and, because of defendant's strength, it took both him and another officer to handcuff defendant.

Before we individually review defendant's contentions raised on appeal, we note that much of our discussion and reasoning in this case is adequately set forth in the dissent in the original opinion. However, in light of our reconsideration of all issues involved and the review of this matter by the entire panel, the repetition of the analysis contained therein is necessary here. Because our disposition has changed upon this reconsideration, it is necessary to address and discuss each of the issues raised by defendant.

Defendant first argues that he was denied his sixth amendment right to the effective assistance of counsel where defense counsel was subject to pending disciplinary proceedings for professional misconduct while he was acting as defendant's counsel. Defendant asserts that defense counsel's alleged incompetence was shown by his inadequate preparation for trial as evidenced by his: (1) failure to question the victim about sexual relations with another on the night of May 30, 1986; (2) failure to introduce medical records documenting defendant's disability; and (3) conducting rambling cross-examinations indicating his failure to conduct a pretrial investigation.

The purpose of the constitutional requirement that a defendant is entitled to the effective assistance of counsel is to insure that the defendant will receive a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Moreover, the benchmark for determining an ineffective assistance of counsel claim is whether counsel's performance so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. (*People v. Cunningham* (1989), 191 Ill. App. 3d 332, 337, 547 N.E.2d 765.) In order for a defendant to succeed on an ineffective assistance of counsel claim, he must show that counsel's performance was so deficient that it fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Moreover, counsel's performance does not constitute ineffective assistance unless it is shown that the performance prejudiced the defense of the case. *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Barnard* (1984), 104 Ill. 2d 218, 233, 470 N.E.2d 1005.

In determining whether a defendant has been prejudiced, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) Furthermore, a totality of the evidence presented to the trier of fact must be considered when a court makes its determination that a reasonable probability exists that but for counsel's errors the result of the proceedings would have been different. *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1083, 518 N.E.2d 669; *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 1077-78, 501 N.E.2d 863.

The *Strickland v. Washington* Court further concluded that it is unnecessary for courts to determine whether counsel's performance was deficient before analyzing the prejudice suffered by the defendant as a result of the alleged deficiencies. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Enoch* (1988), 122 Ill. 2d 176, 201, 522 N.E.2d 1124, 1137.) Moreover, the Illinois Supreme Court has recently held that in order for a defendant to establish prejudice, he must demonstrate, "not simply a possibility of prejudice, but that the claimed error worked to his actual and substantial disadvantage." *People v. Owens* (1989), 129 Ill. 2d 303, 318, 544 N.E.2d 276.

The State correctly argues that there exists a strong presumption that conduct by counsel which involves trial strategy falls within reasonable professional judgment; therefore, a review of counsel's competence will not be extended to his exercise of judgment, discretion or trial tactics. (*Cunningham*, 191 Ill. App. 3d 332.) However, defendant argues that the instant case is governed by *People v. Williams* (1982), 93 Ill. 2d 309, 324, 444 N.E.2d 136, wherein the Illinois Supreme Court concluded that pending proceedings before the Attorney Registration and Disciplinary Commission of the supreme court of Illinois during the same period that an attorney was representing three of four defendants in a capital case may have affected counsel's ability to represent his client. Defendant argues that, in the case at bar, there were pending at the time of trial disciplinary proceedings against trial counsel which impaired counsel's performance. He further maintains that such impairment resulted in an inability by counsel to adequately defend his client and, hence, a denial of competent representation.

We have previously held that the pendency of disciplinary proceedings alone does not necessarily establish that an attorney is incompetent to defend a person charged with a crime. (*People v. Perry* (1989), 183 Ill. App. 3d 534, 540, 540 N.E.2d 379.) Defendant's reliance on *Williams* is misplaced. The factual matrix of that case is so totally

distinguishable from the case at bar that it lends no support to defendant's theory. *Williams* was a capital case in which the defense counsel represented three of four defendants. Two juries were impaneled and the trials were held simultaneously with counsel representing clients before both juries. At the same time, trial counsel had pending complaints before the Attorney Registration and Disciplinary Commission (ARDC). Upon conviction and imposition of the death penalty for defendant Williams, the court initially affirmed on appeal both the conviction and the sentence. However, while a petition for rehearing was pending, the trial counsel's disciplinary case was orally argued in the supreme court. (He was subsequently disbarred, *In re Weston* (1982), 92 Ill. 2d 431, 442 N.E.2d 236.) It was at that time that the court became aware of matters which it subsequently determined could have impacted adversely on counsel's performance at defendant Williams' trial. Based upon these revelations, which included a statement by counsel regarding his mental and physical condition as a result of his woes, the supreme court granted the petition for rehearing, reversing and remanding the case for a new trial.

In granting the defendant a new trial, the court stated that because of the newly acquired information pertaining to counsel's troubles with the ARDC pending at the same time as this procedurally complex capital case was being tried, it could no "longer say, with any degree of assurance, that Williams received the effective assistance of counsel guaranteed by the Constitution." (*Williams*, 93 Ill. 2d at 324.) The *Williams* court cited numerous instances of inaction by counsel which under ordinary circumstances might have been attributable to either trial strategy or even an error in judgment, which does not establish incompetency. (See *People v. Washington* (1968), 41 Ill. 2d 16, 21, 241 N.E.2d 425; *People v. Green* (1967), 36 Ill. 2d 349, 351, 223 N.E.2d 101.) However, because of the uniqueness of the situation, the supreme court declined to apply the established tests generally applied in deciding whether a defendant has been deprived of his constitutional right to the assistance of counsel. (*Williams*, 93 Ill. 2d at 325.) The court went on to say "considering the unique circumstances and sequence of events in this capital case, which will *rarely, if ever, be duplicated*, that the interests of justice require that Dennis Williams be granted a new trial." (Emphasis added.) *Williams*, 93 Ill. 2d at 325.

It is our view that the instant case hardly duplicates the factual circumstances found in *Williams*. It is a one defendant, nonjury, noncapital, noncomplex case. The unique complexities existing in the *Williams* case are nonexistent here. Accordingly, we see no fundamental

fairness necessity to abandon the established test used to determine the deprivation of effective assistance of counsel.

The second prong of defendant's contention regarding ineffective assistance of counsel is that because a potential conflict of interest existed between himself and trial counsel, he was entitled to be admonished in detail regarding the nature of the conflict. He argues that notwithstanding a lack of actual incompetence the devastating burden and emotional stress of an attorney being subjected to disciplinary proceedings constitutes a conflict *per se* and must be intelligently and knowingly waived expressly by the client. He suggests that the proceeding which took place in the trial court addressing the waiver was a sham. If a conflict *per se* exists and if no intelligent waiver occurs, he contends no prejudice need be shown to support a reversal. In support of this argument defendant cites *Williams* (93 Ill. 2d 309), *People v. Brown* (1980), 80 Ill. App. 3d 616, 399 N.E.2d 1374, and Supreme Court Rule 401(a) (107 Ill. 2d R. 401(a)). As previously mentioned, *Williams* is inapposite. So, too, are *Brown* and Supreme Court Rule 401(a). In *Brown,* the statutory procedural safeguards are set forth concerning the waiver of a criminal defendant's right to be represented by counsel and to proceed without any attorney.

The defendant has a fundamental right to receive effective assistance of counsel which requires that the defendant be afforded counsel who is free of conflicting interest or inconsistent obligations. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Thomas* (1989), 131 Ill. 2d 104, 111, 545 N.E.2d 654; *People v. Olinger* (1986), 112 Ill. 2d 324, 339, 493 N.E.2d 579.) The defendant is not required to show the existence of prejudice in order to justify a reversal of his conviction where defense counsel has an actual or possible conflict of professional interest. (*Thomas,* 131 Ill. 2d at 111; *People v. Free* (1986), 112 Ill. 2d 154, 167, 492 N.E.2d 1269; *People v. Washington* (1984), 101 Ill. 2d 104, 110.) Hence, we look at defendant's *per se* contention in light of our supreme court's mandate and we have reconsidered this matter in light of that court's decision in *Szabo.* In *Szabo,* the defendant challenged his convictions of two counts of felony murder and one count of conspiracy to commit armed robbery arguing that he had received ineffective assistance of counsel because of his attorney's pending problems before the ARDC which subsequently led to counsel's disbarment. He also relied on the *Williams* decision. However, in *Szabo,* the Illinois Supreme Court held "that the *Williams* decision was an aberration peculiar to the facts of that case" and declined to follow its holding. (*Szabo,* 144 Ill. 2d at 529.) We believe that the *Szabo* decision rejects the proposition that a

*per se* ineffective assistance of counsel claim is established through a showing that disciplinary proceedings existed or were pending against counsel while he was representing defendant at trial.

■ Under the facts of this case, although we do not view trial counsel's representation as a *per se* conflict of interest, we nevertheless still look to the existence of prejudice to determine if defendant was deprived of his constitutional right to the effective assistance of counsel. A defendant may waive the right to a conflict-free counsel (*Holloway v. Arkansas* (1978), 435 U.S. 475, 483 n.5, 55 L. Ed. 2d 426, 433 n.5, 98 S. Ct. 1173, 1178 n.5), but the waiver must be knowingly made. (*Olinger*, 112 Ill. 2d at 339; *People v. Kester* (1977), 66 Ill. 2d 162, 168, 361 N.E.2d 569.) It is well settled that a defendant has not validly waived a conflict of interest unless he is admonished regarding the existence and the significance of the conflict. (*Olinger*, 112 Ill. 2d at 339; *Kester*, 66 Ill. 2d at 168.) In this case, defendant was in fact advised that counsel had pending disciplinary charges before the Attorney Registration and Disciplinary Commission, and the defendant persisted in his desire to be represented by Mr. Levin. Defendant signed an acknowledgement form which set forth Mr. Levin's problem with the ARDC wherein he agreed nevertheless to retain Mr. Levin as his defense attorney. Specifically, the acknowledgement stated:

> *"ACKNOWLEDGEMENT*
>
> I, James Washington, acknowledge that I wish to retain SHERWOOD L. LEVIN for a criminal case I now have pending.
>
> I have been advised by said SHERWOOD L. LEVIN that he has disciplinary charges pending and knowing that it is still my desire that he represent me in this matter.
>
> DATED: August 1, 1986
>
> ———————————
> (Signature)"

The following colloquy occurred in the presence of the defendant:

> "MR. LEVIN [Defense attorney]: Judge, I'm told, as I indicated to the Court, I thought there was a written waiver in the court file.
>
> THE COURT: Okay. Record should reflect that I talked to Counsel concerning some ARDC problems that he may be having, and he has indicated that his client is aware of that and there's a waiver, is that right, Mr. Washington?
>
> THE DEFENDANT: Yes.

MR. LEVIN: I again talked with him, Judge, and he's indicated to me he wishes to proceed today with my representing him, and wishes to persist in his waiver of a jury trial.

THE COURT: And if I recall right, none of the problems that you are having or were having had anything to do with ability.

MR. LEVIN: That's correct, your Honor.

THE COURT: Or competency to handle matters, okay? Mr. Washington, your desire is still the same in relation to a jury? In other words, you are still giving up your right to a jury trial?

THE DEFENDANT: Yes, sir, your Honor.

THE COURT: Okay. Jury waiver received."

■■ While the defendant was informed of the disciplinary matter, it is not clear from the record that defendant knowingly and intelligently waived his right to a conflict-free lawyer. Neither the written acknowledgement nor the explanation given by the trial court guides the defendant in comprehending why there could be a conflict of interest. Moreover, the trial court did not explain the significance of the conflict and its potential impact on the attorney's representation. (*Olinger*, 112 Ill. 2d 324, 493 N.E.2d 579.) Additionally, the record is devoid of any evidence that would support an argument that the trial court considered defendant's background, conduct and experience in its determination as to whether or not an intelligent waiver occurred. See *Washington*, 101 Ill. 2d at 114; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.

In *Olinger* the Illinois Supreme Court stated that "[a] defendant will not be deemed to have waived a conflict unless he is admonished as to the existence of the conflict and its significance." (*Olinger*, 112 Ill. 2d at 339.) There the trial court tendered transcripts of tape-recorded evidence to be used against the attorney after it advised defendant of an investigation of his attorney which conceivably could lead to a conflict of interest and criminal charges. Such an extensive undertaking by the court did not occur in the instant case. In light of the foregoing, we are unable to conclude that defendant knowingly and intelligently waived his right to a conflict-free attorney.

Consequently, assuming *arguendo* that a *per se* conflict of interest existed, we would submit that an examination of defendant's waiver reveals that the waiver was inadequate. However, because it is our opinion that no conflict *per se* existed, we need not look at the waiver, but rather we are only required to make a determination of whether the attorney's specific performance was so deficient as to result in

prejudice, thereby depriving defendant of his constitutional right to effective assistance of counsel.

Initially, defendant complains of the failure of his attorney to pursue a line of questioning on cross-examination relating to complainant's sexual activities on the evening in question with persons other than himself. He postulates that had such questioning occurred it could have provided an explanation for the presence of semen and spermatozoa in her vagina. He opines that such interrogation would not have been barred by the rape shield law. (Ill. Rev. Stat. 1985, ch. 38, par. 115—7.) It is his view that the rape shield law only precludes as evidence prior sexual activity. The prosecution, however, disagrees as it argues that the rape shield law does apply and also that the decision not to cross-examine complainant on this issue may have been simply trial strategy. We agree.

First, we find that section 115—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—7), commonly known as the rape shield statute, would have excluded defendant in a trial on charges of criminal sexual assault and aggravated criminal sexual assault from cross-examining the victim about her purported sexual activities with other persons and alleged prostitution. See *People v. Sandoval* (1990), 135 Ill. 2d 159, 191-92, 552 N.E.2d 726; *People v. Grant* (1992), 232 Ill. App. 3d 93, 103, 596 N.E.2d 813.

Recognizing that there exist certain situations in which the preclusion of the rape shield statute may not apply because of the defendant's greater constitutional right to confrontation, we, however, conclude that we are not here confronted with such an applicable situation. (See *Sandoval*, 135 Ill. 2d at 191-92.) Moreover, even assuming *arguendo* that we were confronted with an applicable situation demanding emphasis of the right of confrontation over the preclusion of the rape shield statute, we would be inclined to agree with the State's argument that the decision not to conduct the kind of cross-examination now suggested in retrospect by the defendant can be viewed as trial strategy. There appears nothing in the record to suggest that counsel knew he would get a favorable response from such questioning. It is a matter of sound trial practice not to ask questions if you are unsure of what the answer might be. Hence, we cannot say that counsel's failure to pursue such questioning was not a sound trial strategy. Further, although it may have been improper under the rape shield law to pursue such questioning, the tactic that counsel pursued instead was to argue inferences in his closing argument:

"MR. LEVIN [Defense counsel]: I would submit to the Court that although the laboratory ultimately found the presence of semen in the vaginal area of [the victim], there is nothing, your Honor, that links that semen to this defendant.

I would [state] to the Court that she is more than likely having a relationship with [P.S.] who was her live in boyfriend. That there is a likelihood that she has on occasions close in time to the incident had sexual relations with him. She's also, I would submit to the Court, a prostitute. There is nothing, your Honor, that singles out James Washington as having been the person who deposited the semen found in her vagina as opposed to any other person."

█ Additionally, defendant contends that his lawyer's representation was deficient as a result of his failure to introduce into evidence medical records which documented his disability in his left hand. It is axiomatic that one cannot expect to receive perfect representation nor does the constitution require it. (*People v. Blommaert* (1989), 184 Ill. App. 3d 1065, 1075, 541 N.E.2d 144; *People v. Jackson* (1986), 145 Ill. App. 3d 789, 795, 495 N.E.2d 1359.) While medical records might have provided corroboration of defendant's disability, the trial court had an opportunity to see the defendant's use or nonuse of his left hand and by his remark was convinced that the defendant had a disability. The defendant maintained that he lacked the physical strength in his left hand to "hold a knife" or "swing a bottle" as alleged by P.S. and the victim. The trial court expressed concern with the evidence presented regarding defendant's disability by stating that, "there is no question about the fact that the defendant has a problem with his left hand. Whether it's anywhere near as serious as he indicates, I doubt it. But he does have some kind of problem with his left hand. And he does have a hand that apparently cannot be opened all the way." While medical records, if they existed, may have tended to corroborate the defendant's claim of lack of strength, we cannot say that counsel's failure to introduce such records rises to the level of incompetency, nor do we find that the absence of such evidence substantially prejudiced the defendant. Defendant displayed his inability to open his hand more than two-thirds of the way, demonstrating that his fingers were unable to bend; showed that while he could hold a styrofoam cup with the left hand, he was unable to lift it, and provided the court with an explanation of the paralysis. Moreover, even if counsel's failure to provide such evidence can be deemed an error in judgment, no prejudice resulted since the court found that the State's witness, P.S., corroborated the defendant's explanation of his infir-

mity. The court found that the paralysis in the defendant's left hand provided an explanation to P.S.'s testimony on behalf of the prosecution that defendant's friends had switched the knife out of defendant's left hand while he and P.S. were fighting.

■ Defendant also asserts that his ineffective assistance of counsel claim is further supported by defense counsel's rambling cross-examination indicating a failure by counsel to conduct a pretrial investigation. However, defendant's assertion is not supported by the record. The record indicates that the trial judge commented on defense counsel's "extensive job" of cross-examining the complainant, witnesses and police officers even though "little impeachment" resulted. Defendant did not identify any specific examples of rambling and a review of defense counsel's cross-examination does not support defendant's contention in that connection.

■ It is our view that while the defendant may not have knowingly waived his right to a conflict-free lawyer, he is required to show that he was prejudiced thereby in order to substantiate his claim that he was deprived of the effective assistance of counsel. In light of the foregoing analysis, we see no prejudice suffered by the defendant as a result of Mr. Levin's representation. The record reflects that counsel vigorously examined and cross-examined the witnesses, argued extensively and pointed out conflicting and inconsistent testimony, and generally provided adversarial representation. As pointed out earlier, this case was a bench trial which had no complex issues. We do not find a reasonable doubt that the results of the proceedings would have been different, but for defense counsel's failure to question the victim about sex with others on the night of May 30, 1986, or his failure to introduce medical records relating to defendant's disability, as required by *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246 (see also *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052). In reviewing the record as a whole, it is our view that defendant was given adequate representation.

Defendant next contends that he was not proven guilty of aggravated criminal sexual assault beyond a reasonable doubt where the testimony of the complainant was neither clear and convincing nor corroborated. Defendant argues that the testimony of the State's witnesses was riddled with inconsistent, illogical and confused facts and the tale which was woven by the two witnesses was so ludicrous as to be totally unbelievable.

In order to find defendant guilty of aggravated criminal sexual assault, the trier of fact must find that the accused committed an act of sexual penetration by the use of force or threat of force, and that he

caused the victim bodily harm or had displayed, threatened to use, or had used, a dangerous weapon. (*People v. Tanner* (1986), 142 Ill. App. 3d 165, 168, 491 N.E.2d 776.) The trier of fact is in a superior position to observe the demeanor of the witnesses (*People v. Dixon* (1985), 133 Ill. App. 3d 1073, 1081, 480 N.E.2d 128), and the credibility of the witnesses is a matter for the trier of fact. *People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462; *Dixon*, 133 Ill. App. 3d at 1082; *People v. Baker* (1979), 78 Ill. App. 3d 411, 416, 396 N.E.2d 1174; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318.

■ In the instant case, the resolution of defendant's guilt depended upon the credibility of the witnesses and the weight to be accorded to their testimony. Such determinations are within the province of the trial court. We would note that while there are minor inconsistencies in the testimony of the witnesses regarding collateral or insignificant facts, most of the testimony is corroborated by each witness' statements. Some of the discrepancies complained of include the victim's testimony that the bed was queen-sized and Paul's testimony that the bed was twin or "less than full" size; whether the apartment was or was not seen before the $30 was paid; and whether the victim was menstruating. We consider these first two discrepancies to be minor details irrelevant to the issue of whether or not on May 30, 1986, defendant followed the victim to the bathroom and forced her to have oral and vaginal sex. With respect to whether she was menstruating on May 30, there is no evidence in the record to support that assertion. The stipulation entered into regarding Dr. Gordon's testimony was as follows: "that he examined [victim] and found her to be in the late stage of her menstrual cycle." We would take judicial notice of the scientific fact that the normal menstrual cycle of a female is 28 days. There is nothing contained in the stipulation that Dr. Gordon found the victim to be menstruating. In any event we find this discrepancy to be likewise irrelevant to the central issue of whether defendant forced the victim to have sex with him.

On the other hand, the victim testified to many facts which were corroborated by Paul's testimony, Detective Utter's testimony or the medical stipulation. For instance, she described the sequence of events in the bathroom wherein defendant allegedly entered her orally and vaginally, but that he did not ejaculate in her mouth. The evidence presented at trial was that an oral smear and a vaginal smear were taken and the oral smear was negative but the vaginal smear was positive for semen and spermatozoa. She also testified to being struck in the head with a bottle and to being stabbed by the broken

bottle. During the doctor's examination of her, he observed a puncture wound on the left side of her back and a laceration to her head with accompanying swelling. This was also observed by Detective Utter and by Paul. Paul testified that the defendant tore his pants pocket during the struggle to retrieve the apartment key. Detective Utter testified that he observed that Paul's trouser pocket was torn.

Additionally, the victim immediately informed her boyfriend about the sexual attack and promptly notified the police. We have previously held that a prompt complaint to the police of a rape is sufficient corroboration of a complainant's testimony.

On this issue defendant complains that the trial court's reluctance to convict on the evidence presented is further evidence of the insufficiency of the evidence. It is true that the trial court commented about the high level of intoxication as it related to the witnesses' ability to observe or remember. However, the record reveals that his concerns were satisfied by Detective Utter's testimony that the witnesses provided a coherent account of what took place. While the court also remarked that the police did a "shoddy job," nowhere in this record does the court ever express any doubt of the defendant's guilt. The record reflects that the trial court took its time and very conscientiously and meticulously examined all of the evidence and made extensive findings of fact. The court specifically stated:

"When I heard the witness as I indicated before, I found that she was a credible witness and I found that the witness, P. S., (Paul) was also in that category, and I didn't believe the defendant."

We, therefore, concur that the evidence adduced at trial was sufficient for the trier of fact to conclude that the defendant was guilty beyond a reasonable doubt.

Defendant's final contention is that the trial court considered improper factors in determining his guilt. He specifically maintains that the judge considered several matters outside the trial record in reaching his decision. He posits that the court, at the end of closing arguments, elicited defense counsel to speculate about the motivation prompting the victim and her boyfriend to testify against defendant. Defendant refers to the court's questioning of counsel as his own private investigation. In support of his contention he cites *People v. Harris* (1974), 57 Ill. 2d 228, 314 N.E.2d 465, and *People v. Nelson* (1974), 58 Ill. 2d 61, 317 N.E.2d 31. Defendant's reliance on each of these cases is misplaced.

In *Harris*, the court sought to ascertain whether the alibi presented was the same as in an earlier trial. In so doing the court

there asked the defense counsel what defendants had told him (or his office) on a prior occasion. The trial court found defendants guilty when defense counsel was unable to corroborate defendants' alibi testimony. *Harris* is clearly distinguishable from the case at bar as the court there was actually seeking to learn about evidence elicited in another proceeding part of another record. In the instant case, it is clear that the court was simply trying to comprehend the defendant's theory. Furthermore, there is nothing contained in this record which suggests that the court used the theory advanced by Mr. Levin in determining defendant's guilt.

In *Nelson*, it was alleged that the court had engaged in two fact-finding conferences in its chambers in an *ex parte* meeting with only the State's Attorney. In the instant case, the trial court's questions were propounded in open court to defense counsel in defendant's presence. We have previously sanctioned inquiries of trial counsel for purposes of clarifying material issues in a case. (*People v. Jackson* (1975), 31 Ill. App. 3d 244, 333 N.E.2d 652.) Thus, we view the court's actions in that light. At the very most, the trial judge's conduct was harmless. Defendant has failed to demonstrate in what manner he was prejudiced.

█ Defendant also contends that the trial court, by its statement that defendant "had no way to account for the puncture wound in the back of the victim," shifted the burden of proof to the defendant. We disagree and view that comment as simply a pointing out that the defendant had attempted to provide an explanation regarding all of the evidence, but that he failed as to that particular evidence. In any event we discern no prejudice to the defendant by virtue of the comment.

█ The defendant's final complaint regarding the court's improper use of factors relates to the court's comment of the victim's cooperation. He contends that the court based its finding of guilt on her cooperation in prosecuting defendant despite the fact that she had previously failed to appear and a rule to show cause was issued. The court's comments, however, clearly reflect that it was fully aware that initially she did fail to appear. It commented that the State had problems getting her to appear at the outset, but that when she did begin to appear she did so steadily and unfailingly. It is proper for the trial court to comment on the possible bias or interest a witness may have in testifying. *People v. Brown* (1975), 32 Ill. App. 3d 182, 336 N.E.2d 523.

Accordingly, for all of the foregoing reasons, we affirm the judgment of the trial court finding defendant guilty of aggravated criminal sexual assault.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.